No. 23-2194

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GenBioPro, Inc.,

*Plaintiff-Appellant*,

v.

Kristina D. Raynes, *in her official capacity as Prosecuting Attorney of Putnam County*, and Patrick Morrisey, *in his official capacity as Attorney General of West Virginia*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of West Virginia (Huntington),
No. 3:23-cv-00058, Hon. Robert C. Chambers

## OPENING BRIEF OF PLAINTIFF-APPELLANT
## GENBIOPRO, INC.

Skye L. Perryman
Carrie Y. Flaxman
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
sperryman@democracyforward.org

John P. Elwood
Daphne O'Connor
Robert J. Katerberg
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 942-5000
john.elwood@arnoldporter.com

David C. Frederick
Ariela M. Migdal
Derek C. Reinbold
Eliana Margo Pfeffer
Mary Charlotte Y. Carroll
Abigail E. DeHart
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite
400 Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com

*Counsel for GenBioPro, Inc.*

February 7, 2024

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>23-2194</u>        Caption: <u>GenBioPro, Inc. v. Kristina Raynes et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>GenBioPro, Inc.</u>
(name of party/amicus)

_____

 who is <u>Plaintiff-Appellant</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.      Does party/amicus have any parent corporations?        ☑ YES ☐ NO
        If yes, identify all parent corporations, including all generations of parent corporations:

         Xenia Holdco, LLC



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?        ☐ YES ☑ NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ David C. Frederick          Date: ____02/07/2024____

Counsel for: GenBioPro, Inc.

[ Print to PDF for Filing ]

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT.............................ii

TABLE OF AUTHORITIES ..................................................vi

INTRODUCTION ................................................................ 1

JURISDICTIONAL STATEMENT ........................................ 4

STATEMENT OF THE ISSUES............................................ 5

STATEMENT OF THE CASE ............................................... 5

I.    Federal Statutory And Regulatory Framework............................. 5

      A.    Congress Enacted Statutes Promoting Prescription
            Drugs' Availability, With FDA As Gatekeeper...................... 5

      B.    Congress Authorized FDA To Regulate Certain Drugs
            Comprehensively ................................................................ 7

      C.    FDA Regulates Mifepristone's Prescribing And
            Dispensing ........................................................................ 11

II.   West Virginia's Restrictions On Mifepristone .............................. 14

III.  Procedural History ......................................................................... 19

SUMMARY OF ARGUMENT .................................................... 22

STANDARD OF REVIEW......................................................... 25

ARGUMENT ............................................................................ 25

I.    CONGRESS PREEMPTED WEST VIRGINIA'S
      RESTRICTIONS ON MIFEPRISTONE........................................ 25

      A.    Congress Occupied The Field Of Regulating Access To
            REMS Drugs With Safe-Use Elements................................. 26

iii

1. Congress established pervasive regulation of access to drugs with safe-use elements .......................27

2. Congress has a dominant federal interest in regulating access to REMS drugs with safe-use elements .......................................................31

3. Pervasive and uniform federal regulation leaves no room for West Virginia to restrict access to mifepristone ..................................................39

B. West Virginia's Restrictions Impermissibly Interfere With FDA's Required Determinations ..................................42

1. West Virginia's laws make it impossible for GenBioPro to provide mifepristone in accordance with the REMS...............................................42

2. West Virginia's laws interfere with the balance Congress and FDA struck............................44

II. THE DISTRICT COURT ERRED IN HOLDING THAT THE FDAAA DOES NOT PREEMPT WEST VIRGINIA'S RESTRICTIONS ON MIFEPRISTONE........................................52

A. The District Court Erred In Analyzing Field Preemption ............................................................52

1. The district court misidentified the regulatory field .................................................................52

2. The district court misconstrued cases addressing state tort claims to define the field ..............................55

3. The district court erroneously distinguished the savings clause in *Locke* and misconstrued the FDCA's 1962 savings clause.........................57

B. The District Court Erred In Analyzing Conflict Preemption ...........................................................59

1. The district court erred in holding that the FDAAA does not constrain state regulation ............... 60

2. The district court overstated the relevance of *Casey* and *Dobbs* ............................................. 61

3. The district court drew an untenable distinction between regulating "when" and "how" patients receive mifepristone ...................................... 63

4. The district court misread which entities the UCPA regulates ............................................. 65

5. Neither *Virginia Uranium* nor *National Meat* supports the district court's preemption holding ........ 68

C. The District Court Erred In Applying A Presumption Against Preemption ............................................. 70

1. States do not traditionally restrict access to drugs with safe-use elements ................................. 71

2. No presumption applies because the FDAAA's regulatory regime is comprehensive ........................... 72

CONCLUSION ......................................................... 73

STATEMENT REGARDING ORAL ARGUMENT ................................ 73

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Abdullah v. American Airlines, Inc.,*
181 F.3d 363 (3d Cir. 1999)............................................................53

*AES Sparrows Point LNG, LLC v. Smith,*
470 F. Supp. 2d 586 (D. Md. 2007) ................................................54

*Air Evac EMS, Inc. v. Cheatham,*
910 F.3d 751 (4th Cir. 2018) ..........................................................25

*American Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) ........................................................................61

*Amgen Inc. v. Sandoz Inc.,*
877 F.3d 1315 (Fed. Cir. 2017) ................................................47, 72

*Anderson v. Sara Lee Corp.,*
508 F.3d 181 (4th Cir. 2007) ..........................................................25

*Arizona v. United States,*
567 U.S. 387 (2012) ..................................................................26, 31

*Bell v. Blue Cross & Blue Shield of Okla.,*
823 F.3d 1198 (8th Cir. 2016) ........................................................71

*Bonds v. Leavitt,*
629 F.3d 369 (4th Cir. 2011) ..........................................................25

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ....................................................................62

*Buckman Co. v. Plaintiffs' Legal Comm.,*
531 U.S. 341 (2001) ............................................42, 46, 47, 70

*Campbell v. Hussey,*
368 U.S. 297 (1961) ..................................................................31, 54

*City of Burbank v. Lockheed Air Terminal Inc.*,
411 U.S. 624 (1973) ...................................................26, 31, 32, 33,
34, 35, 36

*Columbia Venture, LLC v. Dewberry & Davis, LLC*,
604 F.3d 824 (4th Cir. 2010) ............................................ 46

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000) ............................................... 42, 43

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ............................................... 61, 62, 63

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) ....................................................... 46

*Empire Healthchoice Assurance, Inc. v. McVeigh*,
547 U.S. 677 (2006) ....................................................... 71

*Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) ............................................... 66, 67

*English v. General Elec. Co.*,
496 U.S. 72 (1990) ............................................ 42, 53, 56, 57

*Farina v. Nokia Inc.*,
625 F.3d 97 (3d Cir. 2010).............................................. 46

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ............................................... 48, 50

*Gade v. National Solid Wastes Mgmt. Ass'n*,
505 U.S. 88, 108 (1992) ............................................... 53

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000) ....................................................... 26

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ....................................................... 72

*Hill v. Florida ex rel. Watson*,
325 U.S. 538 (1945) ....................................................... 48

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ........................................................ 44

*Hughes v. Talen Energy Mktg., LLC,*
    578 U.S. 150 (2016) ...................................................... 27

*International Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ........................................ 46, 59, 61

*Kelly v. Washington ex rel. Foss Co.,*
    302 U.S. 1 (1937) ..................................................... 54, 72

*Kurns v. Railroad Friction Prods. Corp.,*
    565 U.S. 625 (2012) ...................................................... 54

*Maine Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020) ................................................. 35

*Marx v. General Revenue Corp.,*
    568 U.S. 371 (2013) ...................................................... 62

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ................................................. 58, 59

*Mutual Pharm. Co. v. Bartlett,*
    570 U.S. 472 (2013) ................................. 25, 43, 44, 53,
                                            55, 65, 67, 68

*National Ass'n of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007) ...................................................... 60

*National Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ............................. 64, 67, 68, 69, 70

*Navy Fed. Credit Union v. LTD Fin. Servs., LP,*
    972 F.3d 344 (4th Cir. 2020) ....................................... 62

*OpenRisk, LLC v. Microstrategy Servs. Corp.,*
    876 F.3d 518 (4th Cir. 2017) ....................................... 46

*Pedraza v. Shell Oil Co.,*
    942 F.2d 48 (1st Cir. 1991) .......................................... 56

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) ........................................................ 61

*PPL EnergyPlus, LLC v. Nazarian,*
    753 F.3d 467 (4th Cir. 2014) ......................... 27, 36, 37, 67

*Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.,*
    458 U.S. 832 (1982) ................................................... 27, 28

*Ray v. Atlantic Richfield Co.,*
    435 U.S. 151 (1978) ................................... 26, 27, 33, 34,
                                          35, 36, 72

*Sears, Roebuck & Co. v. Stiffel Co.,*
    376 U.S. 225 (1964) ........................................................ 47

*United States v. Locke,*
    529 U.S. 89 (2000) ................................. 25, 34, 42, 48, 53,
                           54, 57, 58, 59, 71, 73

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ......................... 27, 42, 44, 71

*Utility Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ........................................................ 60

*Virginia Uranium, Inc. v. Warren,*
    139 S. Ct. 1894 (2019) ............................................... 68, 69

*Wos v. E.M.A. ex rel. Johnson,*
    568 U.S. 627 (2013) ........................................................ 67

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ................................. 52, 55, 56, 58, 59

*Zimmerman v. Novartis Pharms. Corp.,*
    889 F. Supp. 2d 757 (D. Md. 2012) .............. 70, 71, 72, 73

*Zogenix, Inc. v. Baker,*
    2015 WL 1206354 (D. Mass. Mar. 17, 2015) .................. 32

## CONSTITUTION, STATUTES, AND REGULATION

U.S. Const. art. VI, cl. 2 (Supremacy Clause) ....................................5, 25

Drug Amendments of 1962, Pub. L. No. 87-781, 76 Stat. 780...............57

    § 202, 76 Stat. at 793.........................................................................57

Drug Price Competition and Patent Term Restoration Act of 1984,
    Pub. L. No. 98-417, 98 Stat. 1585 ...................................................6

    § 101, 98 Stat. at 1585 .....................................................................6

Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717,
    52 Stat. 1040 (1938) .......................................................................5

    § 505(a), 52 Stat. at 1052 .................................................................6

    § 505(d)-(e), 52 Stat. at 1052-53......................................................6

Food and Drug Administration Amendments Act of 2007,
    Pub. L. No. 110-85, 121 Stat. 823...................................................1

    pmbl., 121 Stat. at 823 ................................................................7, 45

    § 901, 121 Stat. at 930 (§ 505-1(f)).................................................8

    § 909(b)(1), 121 Stat. at 950-51 .................................................1, 12

Food and Drug Administration Modernization Act of 1997,
    Pub. L. No. 105-115, 111 Stat. 2296................................................7

    § 101(1), 111 Stat. at 2298 ...............................................................7

    § 112(a), 111 Stat. at 2309 ...............................................................7

Food and Drug Administration Safety and Innovation Act,
    Pub. L. No. 112-144, 126 Stat. 993 (2012)......................................7

    § 1001(a), 126 Stat. at 1100-02 .......................................................7

    § 1002, 126 Stat. at 1102...................................................................7

Prescription Drug User Fee Act of 1992, Pub. L. No. 102-571,
106 Stat. 4491 ...................................................................... 6

§ 102(2), 106 Stat. at 4491 ............................................. 6

21 U.S.C.:

§ 301 *et seq.* ......................................................................... 5, 6

§ 355 ..................................................................................... 6

§ 355-1 .................................................................... 5, 28, 47

§ 355-1(a) ........................................................................... 32

§ 355-1(a)(1) ............................................................. 28, 60

§ 355-1(a)(2) .................................................................... 28

§ 355-1(a)(4) .................................................................... 28

§ 355-1(b)(3) ............................................................. 13, 47

§ 355-1(b)(4) ................................................................. 7, 8

§ 355-1(c) ........................................................................... 28

§ 355-1(e) .................................................................... 8, 28

§ 355-1(e)(4) .................................................................... 33

§ 355-1(f) .......................................... 33, 41, 45, 48, 52

§ 355-1(f)(1)(A) ..................................... 10, 58, 60

§ 355-1(f)(1)(B) ............................................................. 28

§ 355-1(f)(2) .................................... 8, 10, 43, 45

§ 355-1(f)(2)(A) ............................................................. 29

§ 355-1(f)(2)(C) .................... 10, 29, 36, 37, 62, 70

§ 355-1(f)(2)(C)(i) ..................................... 48, 70

§ 355-1(f)(2)(C)(i)-(ii) ............................................................... 33

§ 355-1(f)(2)(C)-(D) ........................................................ 2, 3, 10, 35

§ 355-1(f)(2)(D) ......................................................... 29, 33, 37, 62

§ 355-1(f)(3)(A) ..................................................................... 11

§ 355-1(f)(3)(B) ................................................................. 11, 30

§ 355-1(f)(3)(D) ..................................................................... 49

§ 355-1(f)(5) ...................................................................... 37, 47

§ 355-1(f)(5)(A) ..................................................................... 29

§ 355-1(f)(5)(B) ................................... 11, 29, 34, 35, 47, 60

§ 355-1(f)(5)(C) ................................................................ 29, 60

§ 355-1(f)(5)(C)(ii) .......................................................... 11, 35

§ 355-1(f)(6) ......................................................................... 11

§ 356 ................................................................................... 7

§ 356c(g) ............................................................................... 7

§ 356c-1 ............................................................................... 7

§ 393(b)(1) ............................................................................ 6

28 U.S.C.:

§ 1291 ................................................................................. 5

§ 1331 ................................................................................. 4

§ 1343(a)(3) .......................................................................... 4

42 U.S.C. § 1983 ...................................................................... 5

W. Va. Code:

§ 2-2-10(a)(9) .................................................................. 44

§ 16-2I-2 ............................................................... 17, 50, 51

§ 16-2I-2(a)(4)(A) ................................................... 17, 51

§ 16-2I-2(b)(2) ................................................................ 17

§ 16-2I-2(b)(4) ................................................................ 17

§ 16-2I-2(c)(3) ................................................................. 17

§ 16-2R-1 *et seq.* .............................................. 2, 14, 39, 41

§ 16-2R-2 ..................................................... 15, 16, 18, 44, 66

§ 16-2R-3 ................................................................. 39, 49

§ 16-2R-3(a) ...................................................... 15, 16, 66

§ 16-2R-3(a)-(b) ........................................................... 50

§ 16-2R-3(b) .................................................................. 15

§ 16-2R-7 ............................................................. 15, 40, 66

§ 16-2R-9 ...................................................................... 17

§ 30-1-26(b)(9) .................................................... 16, 21

§ 30-3-13a(g)(5) .................................................. 16, 21

§ 30-3E-1 ..................................................................... 40

§30-3E-12 ..................................................................... 40

§ 30-7-1 ....................................................................... 41

§ 30-7-15b(a) ................................................................. 41

§ 61-2-8 ......................................................... 2, 14, 39, 41, 44

§ 61-2-8(a) ..................................................... 15, 16, 40, 66

21 C.F.R. § 314.520(a) .................................................. 12

## LEGISLATIVE MATERIALS

153 Cong. Rec. H10595 (daily ed. Sept. 19, 2007) ................................... 38

153 Cong. Rec. (daily ed. May 9, 2007):

    p. S5759 ................................................... 12

    p. S5765 ................................................... 12

153 Cong. Rec. (daily ed. May 2, 2007):

    p. S5444 ................................................... 12

    p. S5469 ................................................... 12

*Discussion Drafts Concerning Prescription Drug User Fee Act Reauthorization, Medical Device User Fee and Modernization Act Reauthorization, Drug Safety, and Certain Pediatric Pharmaceutical and Device Legislation: Hearing Before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 110th Cong. (2007):

    p. 50 ................................................... 38

    p. 54 ................................................... 38

## OTHER AUTHORITIES

*Risk Evaluation and Mitigation Strategies (REMS)*:

    *REMS Single Shared System for Mifepristone 200 mg*, FDA (Mar. 2023), https://www.accessdata.fda. gov/drugsatfda_docs/rems/Mifepristone_2023_ 03_23_REMS_Full.pdf ...................... 8, 13, 14, 30, 40, 43, 50, 51

*Ambrisentan Shared System REMS Program*, FDA (June 2021), https://www.accessdata.fda.gov/drugsatfda _docs/rems/Ambrisentan_Shared_System_2021_06_08_REM S_Full.pdf....................................................................8, 9

*Aveed REMS Program*, FDA (May 2022), https://www.accessdata.fda.gov/drugsatfda_docs/ rems/Aveed_2022_05_26_REMS_Full.pdf ..............................30, 31

*Isotretinoin (iPLEDGE®) Shared System REMS Program*, FDA (Oct. 2023), https://www.accessdata. fda.gov/drugsatfda_docs/rems/Isotretinoin_ 2023_10_03_REMS_Full.pdf................................................9, 49, 52

*Lenalidomide REMS Program*, FDA (Mar. 2023), https://www.accessdata.fda.gov/drugsatfda_docs/rems/ Lenalidomide_2023_03_24_REMS_Full.pdf ....................................9

*SPRAVATO (esketamine) REMS Program*, FDA (Jan. 2022), https://www.accessdata.fda.gov/drugsatfda_docs /rems/Spravato_2022_01_03_REMS_Full.pdf................................9

Carol Ballentine, *Sulfanilamide Disaster*, FDA Consumer (June 1981), https://www.fda.gov/files/about%20fda /published/The-Sulfanilamide-Disaster.pdf ....................................6

Identification of Drug and Biological Products Deemed to Have Risk Evaluation and Mitigation Strategies for Purposes of the Food and Drug Administration Amendments Act of 2007, 73 Fed. Reg. 16313 (Mar. 27, 2008) ................................12, 13

Letter from Ctr. for Drug Evaluation & Rsch., FDA, to S. Arnold, Vice President, Population Council (Sept. 28, 2000), https://www.accessdata.fda.gov/drugsatfda_docs/ appletter/2000/20687appltr.pdf ......................................................12

Letter from J. Woodcock, FDA, to D. Harrison, Am. Ass'n of Pro Life Obstetricians & Gynecologists (Mar. 29, 2016), https://downloads.regulations.gov/FDA-2002-P-0364- 0002/attachment_1.pdf............................................................48, 49

Letter from P. Cavazzoni, Dir., FDA, to D. Harrison, Exec. Dir.,
    Am. Ass'n of Pro-Life Obstetricians & Gynecologists
    (Dec. 16, 2021), https://www.regulations.gov/document/FDA-
    2019-P-1534-0016 ........................................................................... 13

**INTRODUCTION**

This case concerns West Virginia's laws restricting access to the drug mifepristone. These laws contravene Congress's determination that only the U.S. Food and Drug Administration ("FDA") may regulate access to that drug. They are, therefore, preempted.

Mifepristone is the first in a two-drug regimen used for early termination of pregnancy. FDA approved mifepristone in 2000 under a program that enabled the agency to regulate certain drugs closely, including how those drugs are prescribed and dispensed. Congress codified this program in the Food and Drug Administration Amendments Act of 2007 ("FDAAA"). That statute authorized FDA to impose a "risk evaluation and mitigation strategy" ("REMS") on certain medications and deemed mifepristone already to have such a REMS in effect. Pub. L. No. 110-85, § 909(b)(1), 121 Stat. 823, 950, *reprinted at* 21 U.S.C. § 331 note. In a REMS, FDA can regulate a drug end-to-end, including how it is packaged, dispensed, prescribed, and disposed of.

The FDAAA authorizes FDA to impose additional restrictions, known as safe-use elements, on a small subset of drugs when the agency determines that additional oversight is necessary to ensure their

benefits outweigh their risks. FDA may impose only restrictions it determines are necessary to assure the drug's safe use. Restrictions "shall . . . not be unduly burdensome on patient access to the drug" and must "minimize the burden on the health care delivery system." 21 U.S.C. § 355-1(f)(2)(C)-(D).

Since 2007, FDA has regulated mifepristone's distribution, prescribing, and dispensing under this statutory command. The FDAAA requires FDA to update mifepristone's REMS and safe-use elements to minimize burdens on patient access and the healthcare delivery system, based on the agency's periodic assessments of evolving scientific evidence and real-world use. Plaintiff-Appellant GenBioPro, which manufactures mifepristone, provides it subject to FDA's regime.

Against this backdrop of comprehensive federal regulation, West Virginia enacted the Unborn Child Protection Act ("UCPA"). The UCPA bans abortion in almost all cases, at any stage of pregnancy. W. Va. Code § 16-2R-1 *et seq.*; *id.* § 61-2-8. Physicians can lose their medical licenses if they prescribe mifepristone in violation of the UCPA, even if they do so in accordance with mifepristone's REMS. The UCPA

makes it a felony for anyone else to sell, prescribe, or dispense mifepristone, outside of the statute's narrow exceptions.

Other West Virginia laws that predate the UCPA and will take effect if a court rules the UCPA unconstitutional restrict access to mifepristone further. These laws require healthcare providers to tell patients information that contradicts mifepristone's REMS before administering the drug; for example, that mifepristone's effects may be reversible. They impose a waiting period before patients can receive mifepristone, something FDA chose not to require.

Federal law preempts West Virginia's laws. When it subjected mifepristone to a REMS with safe-use elements, Congress vested FDA with sole authority to restrict access to the drug. Congress occupied the field of regulating the prescribing and dispensing of drugs with safe-use elements by imposing a pervasive regime that demands uniformity. Congress directed FDA to balance drug safety against patient access and to minimize burdens on "patient access" to those drugs and on "the health care delivery system." 21 U.S.C. § 355-1(f)(2)(C)-(D).

West Virginia's laws destroy that balance and interfere with the role Congress reserved for FDA. To fulfill its congressional mandate,

FDA must be the sole regulator of access to mifepristone. Otherwise, the agency would be required to act against a patchwork of changing state restrictions that would prevent it from assessing whether its restrictions are unduly burdensome, as Congress commanded.

West Virginia's laws conflict with Congress and FDA's determinations about mifepristone. They make it impossible for GenBioPro to provide mifepristone in West Virginia in accordance with the REMS. They impose requirements that FDA declined to impose. And they override the determinations Congress required FDA to make about which restrictions are necessary to ensure mifepristone's safe use while minimizing burdens.

This Court should vacate the district court's opinion, reverse the challenged preemption holdings, and remand with instructions to hold West Virginia's UCPA and other restrictions invalid under the Supremacy Clause.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because GenBioPro's claims present federal questions arising under the laws of the United States, including

the Supremacy Clause of the Constitution, Article VI, Clause 2;

21 U.S.C. § 355-1; and 42 U.S.C. § 1983.  The court entered final

judgment dismissing all claims on November 6, 2023.  JA337.

GenBioPro timely filed a notice of appeal on November 9, 2023,

JA338.  This Court has jurisdiction to hear GenBioPro's appeal under

28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether West Virginia's UCPA is preempted by the FDAAA

and restrictions for use imposed under FDA's statutory authority.

2.    Whether West Virginia's waiting period and counseling

requirement are preempted.

## STATEMENT OF THE CASE

### I.    Federal Statutory And Regulatory Framework

### A.    Congress Enacted Statutes Promoting Prescription Drugs' Availability, With FDA As Gatekeeper

The history of modern drug regulation confirms Congress's intent

to achieve two (at times contradictory) goals:  giving patients access to

necessary drug therapies while ensuring those drugs' safety.  In 1938,

Congress enacted the landmark Federal Food, Drug, and Cosmetic Act

("FDCA"), Pub. L. No. 75-717, 52 Stat. 1040 (codified at 21 U.S.C. § 301

*et seq.*), following one of the most consequential mass poisonings in the 20th century.[1]  The FDCA empowered FDA to prohibit manufacturers from distributing drugs FDA deemed unsafe.  *Id.* § 505(a), (d)-(e), 52 Stat. at 1052-53 (codified at 21 U.S.C. § 355).  Since then, Congress has amended the FDCA dozens of times, responding to public health concerns.

In the 1980s, Congress amended the FDCA to "promote the public health" by increasing drugs' availability.  21 U.S.C. § 393(b)(1); *see*, *e.g.*, Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, § 101, 98 Stat. 1585, 1585 (codified at 21 U.S.C. § 355) (providing abbreviated route to facilitate new drugs' approval).  In 1992, it provided funding to hasten review of new drug applications.  *See* Prescription Drug User Fee Act, Pub. L. No. 102-571, § 102(2), 106 Stat. 4491, 4491, *reprinted at* 21 U.S.C. § 379g note.

In 1997, Congress authorized FDA to expedite approval of drugs treating "a serious or life-threatening condition," finding that "prompt

---

[1] Carol Ballentine, *Sulfanilamide Disaster*, FDA Consumer (June 1981), https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf (discussing 1937 elixir sulfanilamide disaster).

approval" of "new drugs . . . is critical to the improvement of the public health so that patients may enjoy the benefits provided by these therapies."  Food and Drug Administration Modernization Act, Pub. L. No. 105-115, § 101(1), 111 Stat. 2296, 2298, *reprinted at* 21 U.S.C. § 379g note; *id.* § 112(a), 111 Stat. at 2309 (codified at 21 U.S.C. § 356).  And in 2012, Congress required FDA to mitigate drug shortages to ensure access to FDA-approved medications.  Food and Drug Administration Safety and Innovation Act, Pub. L. No. 112-144, §§ 1001(a), 1002, 126 Stat. 993, 1100-02 (codified at 21 U.S.C. §§ 356c(g), 356c-1).

**B.    Congress Authorized FDA To Regulate Certain Drugs Comprehensively**

In 2007, Congress enacted the FDAAA to protect access to necessary therapies.  That statute "enhance[d] [FDA's] postmarket authorities" to regulate how certain drugs move through the market after their approval.  FDAAA pmbl., 121 Stat. at 823.

**1.**    Because all drugs carry some risks, FDA may approve a drug only if it determines that its benefits outweigh those risks.  JA308 (¶ 34).  In the FDAAA, Congress authorized FDA to impose a REMS on drugs "associated with a serious adverse drug experience." 21 U.S.C. § 355-1(b)(4).  Imposing that REMS permits FDA to ensure

that "the benefits of the drug outweigh [its] risks" and approve the drug, expanding access to essential medications. *Id.* A REMS may require manufacturers to include medication guides for patients and to employ special packaging to ensure patients use the drug safely, among other safety features. *Id.* § 355-1(e).

2. In section 505-1(f) of the FDAAA, codified at 21 U.S.C. § 355-1(f), Congress imposed an even more comprehensive regime on a small subset of drugs FDA determines it can approve only with a REMS containing *additional* postmarketing "elements to assure safe use." *Id.* § 355-1(f)(2). Safe-use elements are detailed safety measures regulating every aspect of a drug, including how it is prescribed, distributed, and dispensed. Examples include:

- requiring manufacturers to certify healthcare providers and pharmacies before they can prescribe or dispense the drug[2];
- requiring healthcare providers to tell patients specific information about the drug[3];

---

[2] *REMS Single Shared System for Mifepristone 200 mg* at 1-3, FDA (Mar. 2023) ("2023 Mifepristone REMS"), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2023_03_23_REMS_Full.pdf.

[3] *Ambrisentan Shared System REMS Program* at 2, FDA (June 2021) ("Ambrisentan REMS"), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Ambrisentan_Shared_System_2021_06_08_REMS_Full.pdf.

- limiting the dosages providers may prescribe and pharmacies may dispense[4];

- requiring pharmacies to pass a drug-specific questionnaire before dispensing it[5]; and

- requiring patients:

  - to obtain lab results or complete written examinations before and during treatment[6];

  - to be monitored during and after treatment[7];

  - to use specified forms of contraception while taking the drug[8];

  - to refrain from donating blood or sperm while taking the drug[9]; and

  - to dispose of leftover medication in specific ways.[10]

---

[4] *Lenalidomide REMS Program* at 2-3, 8, FDA (Mar. 2023) ("Lenalidomide REMS"), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Lenalidomide_2023_03_24_REMS_Full.pdf.

[5] *Id.* at 7, 137-39.

[6] Ambrisentan REMS, *supra* note 3, at 3-4; *Isotretinoin (iPLEDGE®) Shared System REMS Program* at 2-3, FDA (Oct. 2023) ("Isotretinoin REMS"), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Isotretinoin_2023_10_03_REMS_Full.pdf.

[7] *SPRAVATO (esketamine) REMS Program* at 1-2, FDA (Jan. 2022), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Spravato_2022_01_03_REMS_Full.pdf.

[8] Isotretinoin REMS, *supra* note 6, at 2, 46; Ambrisentan REMS, *supra* note 3, at 3, 20, 25.

[9] Lenalidomide REMS, *supra* note 4, at 3, 6-7.

[10] *Id.* at 4.

Only drugs subject to REMS with safe-use elements are regulated so comprehensively.

**3.**     When it authorized FDA to regulate how a drug is packaged, prescribed, dispensed, and taken, Congress enacted provisions protecting patients' access to these drugs.  FDA may impose safe-use elements only after determining that a drug requires them to mitigate a "specific serious risk."  21 U.S.C. § 355-1(f)(1)(A).

Congress directed FDA to "[a]ssur[e] access and minimiz[e] burden" when imposing safe-use elements.  *Id.* § 355-1(f)(2).  It mandated that any restrictions "shall" not be "unduly burdensome" on "patient access" and must "minimize the burden on the health care delivery system" to "the extent practicable."  *Id.* § 355-1(f)(2)(C)-(D).  Congress required FDA's assessment of the burden on patient access to "consider[] in particular" three categories of patients:

> (i)   patients with serious or life-threatening diseases or conditions;
>
> (ii)  patients who have difficulty accessing health care (such as patients in rural or medically underserved areas); and
>
> (iii) patients with functional limitations.

*Id.* § 355-1(f)(2)(C).

The FDAAA mandates that FDA "shall" evaluate safe-use elements periodically. FDA must "assess" whether they are "unduly burdensome on patient access to the drug" and whether they practically "minimize the burden on the health care delivery system." *Id.* § 355-1(f)(5)(B). After making that assessment, the agency "shall" modify the safe-use elements "as appropriate," *id.* § 355-1(f)(5)(C)(ii); and "shall promulgate regulations for how a physician may provide the drug," *id.* § 355-1(f)(6). Congress required that any certification necessary for healthcare providers to prescribe the drug "shall be available to any willing provider from a frontier area," and any certification for a pharmacy, practitioner, or healthcare center to dispense the drug "shall be available." *Id.* § 355-1(f)(3)(A), (B).

## C. FDA Regulates Mifepristone's Prescribing And Dispensing

For more than 20 years, FDA has regulated mifepristone with safe-use elements.[11]

---

[11] Medication abortion, as opposed to surgical abortion, refers to using drugs to terminate a pregnancy. JA299 (¶ 2).

**1.** FDA approved branded mifepristone in 2000 for termination of pregnancy up to 49 days' gestation[12] and determined that "postmarketing restrictions . . . [we]re needed to assure [its] safe use." 21 C.F.R. § 314.520(a). FDA required the drug to be prescribed and dispensed to patients by (or under the supervision of) a qualified physician, not by pharmacies. JA19 (¶ 5).

That regime prevailed until 2007, when Congress ratified and augmented it by enacting the FDAAA. The FDAAA specified that mifepristone and 15 other drugs FDA already had approved with safe-use elements would be "deemed to have in effect an approved [REMS]." FDAAA § 909(b)(1), 121 Stat. at 950-51. Senators discussed the fact that the statute would require mifepristone to be distributed under a REMS. *See*, *e.g.*, 153 Cong. Rec. S5759, S5765 (daily ed. May 9, 2007) (statement of Sen. Coburn); 153 Cong. Rec. S5444, S5469 (daily ed. May 2, 2007) (statement of Sen. DeMint). FDA later identified those 16 drugs by name in the Federal Register. *See* Identification of Drug and

---

[12] This is sometimes called mifepristone's "indication," referring to the medical condition the drug is FDA approved to treat. *See* Letter from Ctr. for Drug Evaluation & Rsch., FDA, to S. Arnold, Vice President, Population Council at 1 (Sept. 28, 2000), https://www. accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf.

Biological Products Deemed to Have Risk Evaluation and Mitigation Strategies for Purposes of the Food and Drug Administration Amendments Act of 2007, 73 Fed. Reg. 16313, 16314 (Mar. 27, 2008).

Since 2007, FDA has regulated mifepristone with a REMS containing safe-use elements. As the FDAAA requires, the agency evaluates and updates the restrictions regularly in light of its assessment of evolving scientific evidence, real-world use, and other "data deemed appropriate by the Secretary" of Health and Human Services. 21 U.S.C. § 355-1(b)(3); *see* JA301-302 (¶ 9)

**2.** "FDA has continually eased restrictions on access to mifepristone," JA97, citing the medication's strong safety record. In 2021, FDA eliminated the requirement that mifepristone be dispensed in-person, to "render the REMS less burdensome to healthcare providers and patients."[13] Mifepristone's 2023 REMS enables patients to receive mifepristone through certified pharmacies and by mail.[14]

---

[13] Letter from P. Cavazzoni, Dir., Ctr. for Drug Evaluation & Rsch., FDA, to D. Harrison, Exec. Dir., Am. Ass'n of Pro-Life Obstetricians & Gynecologists at 6 (Dec. 16, 2021), https://www. regulations.gov/document/FDA-2019-P-1534-0016.

[14] *See* 2023 Mifepristone REMS, *supra* note 2, at 1; JA317 (¶ 66).

Mifepristone's current safe-use elements include:

- a Prescriber Agreement Form requiring providers to review the Prescribing Information, possess certain qualifications, and review a Patient Agreement Form with patients;

- a Patient Agreement Form requiring patients to confirm that they will take both mifepristone and misoprostol, have been informed of certain risks of the medication, and should follow up with their healthcare provider within two weeks; and

- a Pharmacy Agreement Form requiring pharmacy representatives to certify that their pharmacy can meet certain shipping, dispensing, and record-keeping requirements, including dispensing mifepristone within four days of receiving a prescription.[15]

## II.    West Virginia's Restrictions On Mifepristone

In September 2022, West Virginia enacted the UCPA, prohibiting abortion in almost all cases, at any stage of pregnancy. W. Va. Code § 16-2R-1 *et seq.*; *id.* § 61-2-8; JA302 (¶ 11).  It does not exempt abortions induced by taking mifepristone in accordance with the REMS.

1.    The UCPA states that "[a]n abortion may not be performed or induced or be attempted to be performed or induced unless in the reasonable medical judgment of a licensed medical professional:  (1) The

---

[15] 2023 Mifepristone REMS, *supra* note 2, at 6-13.

embryo or fetus is nonviable; (2) The pregnancy is ectopic; or (3) A medical emergency exists." W. Va. Code § 16-2R-3(a); JA318 (¶¶ 69-70). The statute contains an exception for a pregnancy that results from rape or incest that has been reported to law enforcement at least 48 hours before the abortion, if the patient is within the first eight weeks of pregnancy. W. Va. Code § 16-2R-3(b).

The law subjects physicians who perform abortions to loss of their professional license. *Id.* § 16-2R-7. It makes it a felony punishable by imprisonment for any other "person" to induce an abortion. *Id.* § 61-2-8(a). It imposes criminal penalties on some healthcare providers eligible to prescribe mifepristone under the REMS, such as registered nurses, if they prescribe mifepristone to induce an abortion. *Id.* § 16-2R-2 (defining "[l]icensed medical professional" as "a person licensed under § 30-3-1 *et seq.*, or § 30-14-1 *et seq.*, of this code," which does not include advanced practice registered nurses licensed under Chapter 30, Article 7, or physician assistants licensed under Chapter 30, Article 3E); JA318-319 (¶ 71).

The UCPA also prohibits "attempt[ing]" to perform or induce an abortion outside of the statute's narrow exceptions. W. Va. Code § 16-

2R-3(a).  It defines an "[a]ttempt to perform or induce an abortion" as an act "that, under the circumstances as the person so acting . . . believes them to be, constitutes a substantial step in a course of conduct intended to culminate in an abortion."  *Id.* § 16-2R-2.  Under this definition, healthcare providers not defined as "[l]icensed medical professional[s]," such as pharmacists, could be held liable for attempt if they provide mifepristone in accordance with the REMS.  *Id.*  (defining "[l]icensed medical professional" to exclude pharmacists, who are licensed under Chapter 30, Article 5 of the West Virginia Code); *id.* § 61-2-8(a) (providing criminal penalties for "[a]ny person other than a licensed medical professional" who "attempts to perform or induce an abortion").

**2.**      West Virginia also banned healthcare providers from prescribing mifepristone by telemedicine.  *Id.* §§ 30-3-13a(g)(5), 30-1-26(b)(9).[16]

**3.**      Before the UCPA took effect, West Virginia restricted access to mifepristone in two additional ways.  First, it required healthcare providers to communicate particular information to patients when

---

[16] These telemedicine provisions are not at issue in this appeal.

prescribing mifepristone. Providers had to tell patients that "it may be possible to counteract the intended effects of a mifepristone chemical abortion by taking progesterone if the female changes her mind, before taking the second drug," *id.* § 16-2I-2(a)(4)(A); and that "the father, if his identity can be determined, is liable to assist in the support of her child," *id.* § 16-2I-2(b)(2). Providers had to "list agencies and entities which offer alternatives to abortion." *Id.* § 16-2I-2(b)(4) (collectively, West Virginia's "counseling requirement").

Second, West Virginia required healthcare providers to obtain patients' "informed consent" at least 24 hours before taking mifepristone. That entailed delivering the information outlined in section 16-2I-2 to patients and requiring them to sign a form affirming that they had been "informed of [the] opportunity to view the ultrasound image" of the fetus. *Id.* § 16-2I-2(c)(3) (West Virginia's "waiting period").

The waiting period and counseling requirement have "no[] effect[]" while the UCPA is in force but become "immediately" operational if the statute is struck down. *Id.* § 16-2R-9.

**4.** In 2019, GenBioPro received FDA approval to sell generic mifepristone. It is the only U.S. company licensed to do so and has sold more than 850,000 units of the drug throughout the United States. JA299-300 (¶ 3). The UCPA, waiting period, and counseling requirement, however, make it impossible for GenBioPro to provide mifepristone in West Virginia for its FDA-approved use in accordance with mifepristone's REMS, as it does in other states. JA303-304 (¶ 16), JA322 (¶ 77).

Major national pharmacy chains that operate stores in West Virginia stated publicly that they intend to sell mifepristone now that the REMS permits retail pharmacies to dispense it. JA322 (¶ 78). HoneyBee Health, which ships prescription drugs nationwide, also would provide mifepristone in the State. JA322 (¶ 78). But the UCPA blocks GenBioPro from providing mifepristone in West Virginia through these healthcare distribution mechanisms by criminalizing any "substantial step in a course of conduct intended to culminate in an abortion" falling outside of the law's narrow exceptions. W. Va. Code § 16-2R-2.

## III. Procedural History

In January 2023, GenBioPro sued, alleging that federal law preempts the UCPA and the State's other restrictions on mifepristone. JA303-304 (¶¶ 15-16).[17] These laws, and the threat of their enforcement, cause GenBioPro economic injury in the form of lost sales, customers, and revenue. JA322 (¶ 79). GenBioPro sought equitable and declaratory relief enjoining Appellees from enforcing West Virginia's unconstitutional laws. JA306 (¶ 26).

1. The district court held that GenBioPro adequately alleged standing and a cognizable injury in the form of lost business opportunities. JA103-106.

2. On August 24, 2023, the district court granted Appellees' motions to dismiss in substantial part. JA254-289. At the outset, it found the major questions doctrine inapplicable, because FDA regulates mifepristone "pursuant to an explicit grant of authority as to a single prescription medication." JA261-262.

---

[17] This brief will cite GenBioPro's First Amended Complaint, JA299-331, except where noted. GenBioPro's First Amended Complaint does not challenge West Virginia's ban on prescribing mifepristone via telemedicine.

The court held that the UCPA was not preempted.  It applied a
"presumption against preemption," reasoning that states historically
regulated "health and safety," and "regulating abortion" and "medical
professionals" are matters of health and safety subject to state police
power.  JA264-266.

The court found no field preemption.  It defined the field as
"health, medicine, and medical licensure," and held it was one in which
states traditionally regulated.  JA275-277.

The court found no conflict preemption, with one exception
described below.  It held that the FDAAA's provisions requiring FDA to
minimize the burden on patient access limited only FDA's *own*
restrictions.  JA266-268.  It reasoned that, when Congress enacted the
FDAAA, a right to terminate early pregnancy was constitutionally
protected.  Therefore, it was implausible to infer that Congress meant
to preempt "state abortion law" that "would have been unconstitutional
at the time."  JA269.

The court also held that the UCPA regulates only "licensed
medical professionals," not GenBioPro.  JA271.  But even if GenBioPro
could assert the interests of healthcare providers, the court found no

conflict, because the REMS "specif[ies] the *methods* by which mifepristone may be prescribed," whereas the UCPA "instructs" providers in West Virginia "to only perform abortions when certain extrinsic criteria are present." JA272 (emphasis added).

The court held that another challenged restriction, West Virginia's ban on prescribing mifepristone via telemedicine, W. Va. Code §§ 30-3-13a(g)(5), 30-1-26(b)(9), conflicts with the REMS, which "reflects a determination by the FDA that when mifepristone is prescribed, it may be prescribed via telemedicine." JA277. It held that Congress "allocated to the FDA" authority to determine "the manner in which mifepristone may be prescribed." JA278. The court observed that West Virginia's waiting period and counseling requirement "might be likewise preempted by direct conflict with the REMS" but declined to rule on these restrictions because they would go into effect only if the court struck down the UCPA. JA278.

**3.** GenBioPro amended its complaint to facilitate entry of a final order. The First Amended Complaint does not challenge West Virginia's telemedicine ban. JA293-296, JA299-331. The district court

entered final judgment on November 6, 2023.  JA337.  GenBioPro timely appealed.  JA338.

## SUMMARY OF ARGUMENT

**I.**     Congress preempted West Virginia's UCPA, waiting period, and counseling requirement.

**A.**     In the FDAAA, Congress occupied the limited field of restrictions on access to drugs subject to a REMS with safe-use elements.  The FDAAA's pervasive regime regulating these drugs end-to-end evinces Congress's intent to displace state law in this area.  That regime vests FDA alone with authority to determine which patients may receive mifepristone, and where, when, and how the drug is prescribed and dispensed.

Congress's dominant interest in subjecting these drugs to uniform regulation demonstrates its preemptive intent.  Because the FDAAA directs FDA to balance safety against access to mifepristone, it leaves no room for state restrictions.  West Virginia's laws encroach on this field by imposing additional burdens on patients' access and on the healthcare delivery system, rendering impossible a uniform FDA scheme governing access to the drug.

**B.** West Virginia's laws conflict with mifepristone's REMS with safe-use elements. They make providing mifepristone in the State practically impossible. The UCPA subjects GenBioPro and its customers to criminal penalties if they provide mifepristone for its FDA-approved use. That law, like the State's mandatory waiting period and counseling requirement, interferes with Congress's goal in passing the FDAAA: to ensure patients' safe access to drugs like mifepristone, with minimal burden.

West Virginia imposes restrictions that FDA determined did not assure patient safety while minimizing burdens on access and on the healthcare delivery system. The UCPA is the most restrictive form of regulation; it bars virtually all patients from access to mifepristone. FDA chose not to restrict mifepristone to certain patient groups.

West Virginia's waiting period requires patients to wait 24 hours before taking mifepristone. FDA chose not to impose a waiting period. West Virginia's counseling requirement requires healthcare providers to tell patients information that contradicts information in the REMS's Patient Agreement Form.

**II.**　　The district court's holding that the FDAAA does not preempt West Virginia's restrictions on mifepristone rests on three errors.

**A.**　　The court misidentified the regulatory field. It failed to recognize that Congress occupied the narrow field of regulating access to REMS drugs subject to safe-use elements.

**B.**　　The court mistakenly held that the FDAAA constrains *FDA's* regulation of mifepristone but permits states to restrict access to the drug. That approach impermissibly allows states to impose restrictions when Congress vested FDA with authority to balance safety against burdens on patients and the healthcare delivery system.

The court erroneously concluded that the UCPA regulates only licensed medical professionals, not GenBioPro. But that statute regulates every person or company in West Virginia that takes a substantial step intending to culminate in an abortion.

**C.**　　The court applied a presumption against preemption, reasoning that the UCPA regulates in an arena of traditional state authority — health and safety. But regulating access to REMS drugs with safe-use elements is an exclusively federal domain.

## STANDARD OF REVIEW

The Court reviews the district court's grant of a motion to dismiss for failure to state a claim de novo. *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011). The Court "must accept as true all of the factual allegations contained in the complaint" and draw reasonable inferences in favor of Plaintiff-Appellant. *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 188 (4th Cir. 2007) (cleaned up).

## ARGUMENT

## I. CONGRESS PREEMPTED WEST VIRGINIA'S RESTRICTIONS ON MIFEPRISTONE

The Supremacy Clause makes the laws of the United States "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Federal preemption of state law is the result of that basic structural guarantee." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 761 (4th Cir. 2018).

Congress can preempt state law by occupying a regulatory field, "leav[ing] no room for the States to impose different or stricter . . . requirements." *United States v. Locke*, 529 U.S. 89, 110 (2000) (cleaned up). In addition, "state laws that conflict with federal law are 'without effect.'" *Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472, 479-80 (2013) (citation omitted). State laws are preempted to the extent

they impede the attainment of Congress's objectives. *Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000).

West Virginia's restrictions on mifepristone are preempted under those doctrines.

### A. Congress Occupied The Field Of Regulating Access To REMS Drugs With Safe-Use Elements

Congress demonstrates an "intent to displace state law altogether" when it creates "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up); *see Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157 (1978) (same). This intent is evident where Congress imposes a "comprehensive scheme of federal control." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 629 (1973).

Congress also can occupy a field "where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (cleaned up); *see Ray*, 435 U.S. at 157 (same). To assess whether federal interests dominate, courts examine whether Congress vested "exclusive authority" in a federal agency to regulate in a particular field. *Ray*, 435 U.S. at 159. A statute emphasizing the mandatory

nature of the agency's obligation to determine which restrictions are

"necessary" "indicates . . . that Congress intended uniform national

standards" to govern the field. *Id.* at 161, 163. So does a statute

vesting a federal agency with exclusive authority "to balance a number

of considerations" in exercising regulatory power. *Id.* at 177.

Each of these factors is present here.

### 1. Congress established pervasive regulation of access to drugs with safe-use elements

When Congress "'regulat[es] so pervasively that there is no room

left for the states to supplement federal law,'" it has occupied that field.

*United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013)

(citation omitted). Statutes setting forth "detailed and comprehensive

regulations" preempt state regulation. *Ramah Navajo Sch. Bd., Inc. v.*

*Bureau of Revenue of N.M.*, 458 U.S. 832, 840 (1982).

In the FDAAA, "Congress has legislated comprehensively" with

respect to drugs subject to a REMS with safe-use elements, "leaving no

room for the States to supplement federal law." *PPL EnergyPlus, LLC*

*v. Nazarian*, 753 F.3d 467, 474 (4th Cir. 2014) (cleaned up)*, aff'd sub*

*nom. Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016); *cf.*

*Ramah*, 458 U.S. at 841-42 (regulatory scheme that articulates detailed

"direction and supervision provided by the Federal Government . . . le[ft] no room for the additional burden" state sought to impose).

Section 355-1 dictates what FDA must do in imposing a REMS. If the Secretary (or specified "division directors") determines, after reviewing enumerated factors, that a REMS "is necessary to ensure that the benefits of [a] drug outweigh the risks of the drug," a drug manufacturer "shall" submit a proposed REMS to the Secretary. 21 U.S.C. § 355-1(a)(1), (2), (4). The Secretary may require a REMS to include additional features if he makes specified determinations as to each one. *Id.* § 355-1(c), (e). A REMS may include a medication guide, patient inserts, a communication plan, packaging requirements, disposal requirements, and safe-use elements. *Id.* § 355-1(e), (f).

Congress requires the Secretary to make specific determinations before imposing safe-use elements. The Secretary must determine that the drug "can be approved only if, or would be withdrawn unless" the safe-use elements are required, and "other elements" described in the statute "are not sufficient." *Id.* § 355-1(f)(1)(B). The elements must be "necessary to assure safe use of the drug." *Id.*

Safe-use elements "shall" "be commensurate with the" drug's specific "serious risk" while not "be[ing] unduly burdensome on patient access to the drug." *Id.* § 355-1(f)(2)(A), (C). They "shall" be designed "to minimize the burden on the health care delivery system" "to the extent practicable." *Id.* § 355-1(f)(2)(D). In designing these elements, the Secretary "shall . . . seek input from patients, physicians, pharmacists, and other health care providers about how" safe-use elements "may be standardized" to minimize those burdens. *Id.* § 355-1(f)(5)(A).

Once FDA imposes safe-use elements, the agency "shall" reevaluate them "periodically" "to assess" whether they are "unduly burdensome on patient access" and "the health care delivery system." *Id.* § 355-1(f)(5)(B). FDA "shall" "seek input from patients" and other participants in the healthcare delivery system to ensure safe-use elements are not "unduly burdensome on patient access" and "minimize the burden on the health care delivery system." *Id.* § 355-1(f)(5)(A). The agency "shall" — "considering such input and evaluations" — modify those elements "as appropriate." *Id.* § 355-1(f)(5)(C). In short,

Congress told FDA which determinations to make and how to make them.

A REMS with safe-use elements governs every aspect of the drug — the who, when, where, and how. For mifepristone, FDA regulates *which* patients may receive the drug and *how*, *from whom* patients may receive a prescription and *how*, and *where* the drug is dispensed. Patients must sign the Patient Agreement Form confirming that they will take mifepristone as directed.[18] Healthcare providers must meet specific eligibility criteria and become specially certified to prescribe mifepristone.[19] Pharmacies, too, must meet eligibility criteria and be specially certified to dispense mifepristone.[20] GenBioPro, the manufacturer, must make these certifications available to providers and pharmacies and ensure that those providers and pharmacies comply with the REMS. *Id.* § 355-1(f)(3)(B).[21] By vesting such

---

[18] 2023 Mifepristone REMS, *supra* note 2, at 10.

[19] *Id.* at 6-9.

[20] *Id.* at 11-13.

[21] REMS for other safe-use drugs are similarly detailed. For example, to become certified to prescribe Aveed, a drug treating hormonal imbalances, providers must ensure their primary healthcare setting is enrolled in the REMS, participate in an educational program, and successfully complete a knowledge assessment. *Risk Evaluation*

"pervasive control" in FDA, Congress left "no room for" "state and local control." *Lockheed*, 411 U.S. at 633, 638.

> ## 2. Congress has a dominant federal interest in regulating access to REMS drugs with safe-use elements

**a.** When a "federal interest" is "dominant," "the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (cleaned up). The federal government has a dominant interest when it must maintain uniform regulatory standards to create workable policy. *Cf. Campbell v. Hussey*, 368 U.S. 297, 300-01 (1961) ("Under the federal law" governing tobacco labeling "there can be but one 'official' standard — one that is 'uniform' and that eliminates all confusion . . . .").

Thus, for immigration policy to be workable, the federal government alone must "maintain[] a comprehensive and unified system to keep track of aliens within the Nation's borders." *Arizona*, 567 U.S. at 401-02. Similarly, to achieve "a uniform and exclusive system of federal regulation" of aircraft noise, federal law required the

_____

*and Mitigation Strategy (REMS) Document* at 2, FDA (May 2022), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Aveed_2022_05_2 6_REMS_Full.pdf.

Federal Aviation Administration to consider "particularized standards": assess specific data, consult with agencies, and evaluate the safety and economic effects of a regulation. *Lockheed*, 411 U.S. at 632, 639. Congress thereby preempted state regulation — after all, "[p]lanes do not wander about in the sky like vagrant clouds" but "move only by federal permission," "under an intricate system of federal commands." *Id.* at 633-34.

Applying these principles here requires the same conclusion. Regulating access to prescription drugs with postmarketing restrictions is a federal function. REMS drugs with safe-use elements do not appear on the market, and are not made available or unavailable, according to the vagaries of state or local law. FDA has had sole authority to approve prescription drugs for marketing in interstate commerce since the inception of modern drug regulation. *See* 21 U.S.C. § 355-1(a).[22] Drugs with safe-use elements can be approved

---

[22] Nor have states banned prescription drugs that FDA approved; a court found that the rare state law attempting to do so would be preempted. *See Zogenix, Inc. v. Baker*, 2015 WL 1206354, at *4 (D. Mass. Mar. 17, 2015) (denying motion to dismiss a preemption challenge to a Massachusetts law purporting to ban an FDA-approved drug).

*only* after FDA makes a series of determinations, including that any restrictions minimize the burdens Congress specified. *Id.* § 355-1(f)(2)(C)-(D). Such drugs may be packaged, prescribed, dispensed, and disposed of only under a comprehensive federal regulatory mechanism. *See id.* § 355-1(e)(4), (f).

"The moment" a drug like this enters the market, "it is caught up in an elaborate and detailed system of controls." *Lockheed*, 411 U.S. at 634 (cleaned up); *see also Ray*, 435 U.S. at 166 n.15 (such statutes demonstrate that Congress considered the subject a "matter[] for national attention," with preemptive effect).

This system is national in reach and character. In requiring FDA to minimize burdens on patient access, Congress identified patient groups by nationally applicable criteria: those in "rural or medically underserved areas," and those with "serious or life-threatening diseases or conditions." 21 U.S.C. § 355-1(f)(2)(C)(i)-(ii). Similarly, Congress ordered FDA to consider the burden on the national "health care delivery system" in calibrating restrictions on access. *Id.* § 355-1(f)(2)(D). These determinations cannot vary by locality, nor can restrictions on access.

It is impossible for FDA to fulfill its requirement to assess whether a given REMS unduly burdens patients if FDA also has to consider a multitude of inconsistent and conflicting state rules. A patchwork of changing state restrictions would prevent FDA from ensuring that restrictions do not unnecessarily burden the healthcare delivery system and are "compatible with established distribution, procurement, and dispensing systems for drugs." *Id.* Yet Congress required FDA to make these assessments and update them periodically. *Id.* § 355-1(f)(5)(B).

**b.** Congress signals its intent to preclude state regulation in a field where it "mandate[s] federal rules on the subjects or matters there specified, demanding uniformity." *Locke*, 529 U.S. at 110; *see also Ray*, 435 U.S. at 163, 166 (Congress mandated uniform federal rules on tanker design, construction, and other topics, preempting state regulation). In *Ray*, the Court emphasized the mandatory nature of the obligation Congress imposed on the Secretary of Transportation, who "'shall establish' such rules and regulations as may be necessary with respect to the design, construction, and operation of the covered vessels." 435 U.S. at 161. Where Congress "did not leave" a federal

agency "to act at large but provided . . . particularized standards" dictating the factors the agency must "consider," state restrictions have no role.  *Lockheed*, 411 U.S. at 632.

Congress's use of "shall" throughout section 355-1 indicates that it vested exclusive authority in FDA to regulate access to drugs with safe-use elements.  *See Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("shall" denotes "mandatory language").  When FDA subjects a drug to safe-use elements, it "shall" periodically reevaluate them, 21 U.S.C. § 355-1(f)(5)(B), and "shall" modify those elements "as appropriate," *id.* § 355-1(f)(5)(C)(ii).  Restrictions may "not be unduly burdensome on patient access to the drug" and must "minimize the burden on the health care delivery system."  *Id.* § 355-1(f)(2)(C)-(D).  The regime's mandatory character "dictates that the federal judgment" about whether, when, and how to restrict access to these drugs "prevail[s] over the contrary state judgment."  *Ray*, 435 U.S. at 165.

c.    Congress demonstrates its "anticipat[ion] that there would be a single decisionmaker" in the field by directing a federal agency to "balance a number of considerations" when it "promulgates limitations."

*Id.* at 177.  When a statute "vest[s]" "pervasive control" in federal agencies and "requires a delicate balance between safety and" another value, it "leave[s] no room" for state "controls."  *Lockheed*, 411 U.S. at 638.

This Court applied that principle in holding that Congress preempted a state program to subsidize a power plant's participation in the federally regulated wholesale energy market.  *PPL EnergyPlus*, 753 F.3d at 474-76.  The Court reasoned that "the federal markets are the product of a finely-wrought scheme that attempts to achieve a variety of different aims" and that "the federal scheme is carefully calibrated to protect a host of competing interests."  *Id.* at 473.  Such a regime "leaves no room either for direct state regulation of the prices of interstate wholesales of energy, or for state regulations which would indirectly achieve the same result."  *Id.* at 475 (cleaned up).

The FDAAA is precisely such a statute.  Congress established the "competing interests" FDA must consider and told the agency how to balance them.  *PPL EnergyPlus*, 753 F.3d at 473.  FDA "shall" consider whether restrictions "unduly" burden patient access to the drug.  21 U.S.C. § 355-1(f)(2)(C).  It must "minimize" burdens on the

healthcare delivery system "to the extent practicable." *Id.* § 355-1(f)(2)(D). The Secretary "shall . . . seek input" from stakeholders to ensure patient access and the healthcare delivery system are not "unduly burden[ed]" and modify any restrictions accordingly. *Id.* § 355-1(f)(5). FDA must seek such input before requiring safe-use elements and when assessing them periodically and must factor this input into the nationally applicable REMS elements. *Id.*

In weighing those burdens, FDA must "consider[] in particular" the impact on particular categories of patients. *Id.* § 355-1(f)(2)(C); *supra* p.10. "[T]o the extent practicable," FDA must "conform" the safe-use elements to "drugs with similar, serious risks" and ensure restrictions are "designed to be compatible with established distribution, procurement, and dispensing systems," "so as to minimize the burden on the health care delivery system." *Id.* § 355-1(f)(2)(D). The scheme is "carefully calibrated to protect a host of competing interests," *PPL EnergyPlus*, 753 F.3d at 473, precluding states from altering the balance of burdens. Permitting states to enact post-hoc rules on REMS drugs with safe-use elements makes FDA balancing of interests impossible.

The FDAAA's legislative history confirms Congress's intent to grant FDA alone authority "to ensure that the balance between the benefit and the risk remains in equilibrium" so that "patients have access to life-saving and life-improving medications." 153 Cong. Rec. H10595 (daily ed. Sept. 19, 2007) (statement of Rep. Barton). Congressional representatives expressed concern that state regulation could undermine FDA's careful balancing and "potentially adversely affect public health."[23] Others worried it would be "counterproductive to public health for States to impose different REMS requirements than those imposed by the FDA"[24] and stressed that allowing state regulation in this area could "be confusing to consumers."[25]

---

[23] *Discussion Drafts Concerning Prescription Drug User Fee Act Reauthorization, Medical Device User Fee and Modernization Act Reauthorization, Drug Safety, and Certain Pediatric Pharmaceutical and Device Legislation: Hearing Before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 110th Cong. 54 (2007) (statement of Rep. John Sullivan).

[24] *Id.* at 50 (statement of Rep. Joseph R. Pitts).

[25] *Id.* at 54 (statement of Rep. John Sullivan).

### 3. Pervasive and uniform federal regulation leaves no room for West Virginia to restrict access to mifepristone

West Virginia's restrictions encroach on the limited field of regulating REMS drugs with safe-use elements. These laws strike a different balance than FDA's. They restrict patients' access to mifepristone; impose different judgments on whether and how healthcare providers may prescribe the drug; and penalize pharmacies for dispensing it under federally permissive rules. Such state interference burdens patients and the healthcare system and destroys FDA's uniform regulation.

First, West Virginia's laws impose severe burdens on patients' access to mifepristone. The UCPA prevents virtually all REMS-eligible patients from receiving the drug. W. Va. Code § 16-2R-1 *et seq.*; *id.* § 61-2-8. A patient must have a nonviable pregnancy or be experiencing a "medical emergency," as narrowly defined by the UCPA, or the pregnancy must result from a reported rape or incest (but only if it is within the first eight weeks of gestation). *Id.* § 16-2R-3.

West Virginia's remaining restrictions constrain patients' access and dictate how providers may prescribe mifepristone. They impose a

waiting period before patients may receive a prescription and require

providers to relay specific information to dissuade patients from seeking

abortion care.  *See supra* pp.16-17.

Federal safe-use elements for mifepristone do not contain those

restrictions.  Eligible patients must only sign a Patient Agreement

Form stating that they "will take mifepristone on Day 1," followed by

"misoprostol tablets 24 to 48 hours after," and that their healthcare

provider has counseled them "regarding the risk of serious

complications associated with mifepristone" (e.g., heavy bleeding and

infection).[26]

West Virginia also imposes burdens, not found in the REMS, on

the healthcare delivery system.  The UCPA subjects doctors to loss of

their license when they prescribe mifepristone for its FDA-approved

use:  abortion.  W. Va. Code § 16-2R-7.  Other licensed healthcare

providers face criminal penalties for providing mifepristone in

accordance with the REMS.  *Id.* § 61-2-8(a).[27]  The UCPA burdens

---

[26] 2023 Mifepristone REMS, *supra* note 2, at 4, 10.

[27] West Virginia allows clinicians such as advanced practice
registered nurses and physician assistants to prescribe drugs and
diagnose patients, making them eligible to prescribe mifepristone under
the 2023 REMS.  2023 Mifepristone REMS, *supra* note 2, at 8;

pharmacies, which cannot provide mifepristone despite being allowed to under the REMS.  *Id.*; *supra* p.18.  And the statute imposes burdens on GenBioPro, which cannot provide the drug in accordance with the REMS.  *See* W. Va. Code § 16-2R-1 *et seq.*; *id.* § 61-2-8; JA322 (¶ 77).

As implemented by FDA, mifepristone's REMS imposes significant burdens on entities in the healthcare supply chain.  *See supra* pp.14, 30. (requiring GenBioPro to certify healthcare providers and pharmacists to prescribe or dispense mifepristone).  But these burdens are entirely different from those West Virginia imposes.

Section 355-1(f) permits only FDA to impose requirements on REMS drugs with safe-use elements.  Such rules must minimize the burden on the healthcare delivery system.  By preventing nearly all patients from obtaining mifepristone and subjecting healthcare providers, including pharmacists, to criminal and other severe penalties, the UCPA *maximizes* the burden.  The UCPA thus disrupts

---

W. Va. Code §§ 30-3E-1, 30-3E-12 (physician assistants); *id.* §§ 30-7-1, 30-7-15b(a) (advanced practice registered nurses); *see supra* pp.15-16 (UCPA subjects advanced practice registered nurses and physician assistants to criminal penalties for prescribing mifepristone to most patients).

the federal "balance of statutory objectives."  *Buckman Co. v. Plaintiffs'*

*Legal Comm.*, 531 U.S. 341, 348 (2001).

## B. West Virginia's Restrictions Impermissibly Interfere With FDA's Required Determinations

State restrictions are "naturally preempted to the extent of any

conflict with a federal statute."  *Crosby v. National Foreign Trade*

*Council*, 530 U.S. 363, 372 (2000) (citations omitted).  Conflict

preemption occurs "when compliance with both state and federal law is

impossible, or when the state law 'stands as an obstacle to the

accomplishment and execution of the full purposes and objective of

Congress.'"  *Locke*, 529 U.S. at 109 (citations omitted).  A state law

obstructs congressional objectives when it inhibits the "execution of the

federal [regulatory] system and interfere[s] with the discretion

entrusted to federal . . . officials."  *South Carolina*, 720 F.3d at 530.

### 1. West Virginia's laws make it impossible for GenBioPro to provide mifepristone in accordance with the REMS

State law is preempted "where it is impossible for a private party

to comply with both state and federal requirements."  *English v.*

*General Elec. Co.*, 496 U.S. 72, 79 (1990).  A party that manufactures a

product subject to conflicting federal and state regulation is not

expected to "pull[]" its product "from the market" or "stop selling" to avoid such a conflict. *Bartlett*, 570 U.S. at 475, 487 n.3 (cleaned up). Moreover, when federal regulations "are drawn not only to bar what they prohibit but to allow what they permit," those federal laws preempt "inconsisten[t]" state law on the same subject matter. *Crosby*, 530 U.S. at 380.

It is impossible for GenBioPro to comply with both mifepristone's REMS and the UCPA without ceasing sales in West Virginia for all intents and purposes. The FDAAA "deemed" mifepristone "to have in effect an approved" REMS in 2007. *Supra* pp.12-13. FDA has updated mifepristone's REMS with safe-use elements over time in response to new data, pursuant to its statutory obligations, to impose only those burdens on access necessary to assure the drug's safe use. 21 U.S.C. § 355-1(f)(2). *Supra* pp.13-14. GenBioPro provides mifepristone for its FDA-approved use in accordance with these detailed requirements. JA299-300 (¶ 3), JA322 (¶ 77). It certifies healthcare providers to prescribe mifepristone and certifies pharmacies to dispense it.[28]

---

[28] 2023 Mifepristone REMS, *supra* note 2, at 1-3.

The UCPA prohibits GenBioPro from conducting its normal business in West Virginia. It bans the medication's use in virtually all circumstances for which it is approved, with highly circumscribed exceptions, and it subjects GenBioPro to potential criminal sanctions for providing it. *See* W. Va. Code § 61-2-8 (criminalizing "[a]ny person . . . who . . . performs, induces, or *attempts* to perform or induce an abortion") (emphasis added); *id.* § 2-2-10(a)(9) (defining "Person" to include "corporations"); *id.* § 16-2R-2 (an "[a]ttempt to perform or induce an abortion" is "an act . . . that . . . constitutes a substantial step in a course of conduct intended to culminate in an abortion"). GenBioPro can comply with both federal and state law only by "pull[ing]" its product "from the market" in West Virginia — something the law does not require. *Bartlett*, 570 U.S. at 475, 487 n.3.

> **2.** **West Virginia's laws interfere with the balance Congress and FDA struck**

**a.** A state law that "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in passing a federal statute is conflict preempted. *South Carolina*, 720 F.3d at 533 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

The FDAAA's preamble states its objective:  to expand access to life-saving drugs that would not be available to patients but for FDA's "enhance[d]" "postmarket authorit[y]."  FDAAA pmbl., 121 Stat. at 823; *see* 21 U.S.C. § 355-1(f).  The statute authorizes FDA to "[p]rovid[e] safe access for patients to drugs with known serious risks that would otherwise be unavailable" by imposing safe-use elements.  21 U.S.C. § 355-1(f).  Any restrictions must "[a]ssur[e] access and minimiz[e] burden" on patient access and the healthcare delivery system.  *Id.* § 355-1(f)(2).  Legislative history confirms the FDAAA's focus on expanding access to covered medication.  *Supra* p.38.  And Congress "deemed" mifepristone to have in effect a REMS assuring patient access to the drug.  FDAAA § 909(b)(1), 121 Stat. at 950-51.

West Virginia's laws thwart this purpose.  They impose severe burdens on patients' access to mifepristone and on the healthcare system.  *See supra* pp.14-17, 44.  This undermines Congress's objectives.

**b.**    "When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives" — "[a]llowing state law to impose a

different standard permits a re-balancing of those considerations." *Farina v. Nokia Inc.*, 625 F.3d 97, 123-24 (3d Cir. 2010) (holding lawsuits challenging federal standards on radio frequency emissions conflict-preempted).

Accordingly, state laws that "upset the careful balance struck by Congress" in a scheme of federal regulation are preempted. *Edgar v. MITE Corp.*, 457 U.S. 624, 634 (1982); *see Buckman*, 531 U.S. at 348 (state laws that "skew[]" a "delicate balance of statutory objectives" are preempted); *OpenRisk, LLC v. Microstrategy Servs. Corp.*, 876 F.3d 518, 523 (4th Cir. 2017) (holding "states may not upset" the "balance" that "Congress . . . struck . . . between the free flow of ideas in the public domain, on the one hand, and the protection of certain forms of intellectual property, on the other"). Even a state law that shares the same objective as the federal regime is preempted if "it interferes with the methods by which the federal statute was designed to reach this goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987); *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 830 (4th Cir. 2010) (same).

These principles require finding that West Virginia's restrictions conflict with the FDAAA. In the FDAAA, Congress established a balance between access and burden. *Supra* pp.33-34. West Virginia's laws upset this balance. They "dramatically increase" burdens on patient access and on the healthcare delivery system. *Buckman*, 531 U.S. at 350; *supra* pp.14-17, 44. They also interfere with Congress's methods, requiring FDA to review data, 21 U.S.C. § 355-1(b)(3); confer with stakeholders, *id.* § 355-1(f)(5); and reassess restrictions to ensure they continue to comply with section 355-1's mandate, *id.* § 355-1(f)(5)(B). *See supra* pp.28-30.

The UCPA and other restrictions do not complement or supplement the FDAAA's objectives. They contradict them, leading to a "clash" between Congress's direction that FDA reduce burdens on access to mifepristone and on the healthcare entities that deliver it, and West Virginia's restrictions on access and its imposition of criminal sanctions on participants in that healthcare delivery system. *Amgen Inc. v. Sandoz Inc.*, 877 F.3d 1315, 1329 (Fed. Cir. 2017) (quoting *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964)).

**c.** Courts find conflict preemption when a federal agency "has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all." *Locke*, 529 U.S. at 110 (applying conflict preemption analysis to part of statute). State law "limit[ing] the availability of an option the [federal agency] considered essential to" ensure its objectives is preempted. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982). When a state and federal law "cannot move freely within the orbit of their respective purposes without infringing upon one another," the state law must yield. *Hill v. Fla. ex rel. Watson*, 325 U.S. 538, 543 (1945) (cleaned up).

The UCPA conflicts with mifepristone's REMS by imposing restrictions FDA determined were unnecessary to assure safety while minimizing burdens. 21 U.S.C. § 355-1(f). The FDAAA requires FDA to determine the situations in which mifepristone is accessible; the agency determines when mifepristone may be safely administered to patients with "serious or life-threatening . . . conditions," including pregnancy. *Id.* § 355-1(f)(2)(C)(i).[29] FDA fulfilled that mandate by determining

---

[29] *See* Letter from J. Woodcock, FDA, to D. Harrison, Am. Ass'n of Pro Life Obstetricians & Gynecologists at 4 n.6 (Mar. 29, 2016) (pregnancy entails a risk of death "approximately 14 times higher" than

patients should be able to access mifepristone through specially certified prescribers and pharmacies.

In other REMS containing safe-use elements, FDA required patients to demonstrate eligibility for the drug by meeting certain diagnostic criteria.[30]  FDA decided not to impose such restrictions for mifepristone.  *Cf. id.* § 355-1(f)(3)(D) (permitting FDA to restrict dispensing to certain patients).  This reflects FDA's determination that such a limitation would unduly burden patient access and the healthcare system.  The UCPA conflicts with this decision, barring access to mifepristone for all patients except those meeting specified, seldom-satisfied criteria.  W. Va. Code § 16-2R-3.

The UCPA also requires providers to apply different criteria in prescribing mifepristone to patients than those FDA imposed.  Under the REMS, a provider who obtains the necessary certification agrees to review the Patient Agreement Form with the patient, "fully explain[]"

---

that "associated with legal abortion"), https://downloads.regulations. gov/FDA-2002-P-0364-0002/attachment_1.pdf.

[30] Isotretinoin's REMS, for example, requires patients who can become pregnant to take a pregnancy test before being prescribed the drug and requires all patients to answer drug-specific "[c]omprehension [q]uestions."  Isotretinoin REMS, *supra* note 6, at 2.

the risks of the treatment regimen, and answer "any questions the patient may have prior to receiving mifepristone."[31]

The UCPA adds a threshold requirement: before a patient can receive mifepristone, the prescriber must assess whether the patient carries a nonviable fetus, is experiencing a medical emergency, or carries a pregnancy of fewer than eight weeks' gestation that resulted from rape or incest that has been reported to law enforcement at least two days prior. *See id.* § 16-2R-3(a)-(b). Only patients satisfying this inquiry can receive mifepristone in West Virginia. But this threshold requirement is not part of the Patient Agreement Form; it is not found in the REMS at all.

By imposing restrictions that FDA did not determine were necessary to assure safety, the UCPA "limit[s] the availability of" mifepristone that "the [federal agency] consider[ed] essential to" meet its statutory goals. *de la Cuesta*, 458 U.S. at 156.

**d.** West Virginia's counseling requirement and waiting period, which will go into effect if the UCPA is ruled unlawful, likewise conflict with mifepristone's safe-use elements. W. Va. Code § 16-2I-2.

_____

[31] 2023 Mifepristone REMS, *supra* note 2, at 1-2, 6.

The REMS's Patient Agreement Form specifies that patients understand they will take both "mifepristone and misoprostol to end [their] pregnancy."[32] The Prescriber Agreement requires only that a physician review the Patient Agreement Form, "fully explain[]" the "risks of the mifepristone treatment regimen," answer any "questions the patient may have," and ensure the patient receives and signs the form.[33] West Virginia requires healthcare providers to communicate the opposite — they must inform patients that "it may be possible to counteract the intended effects of . . . mifepristone . . . by taking" misoprostol. *Id.* § 16-2I-2(a)(4)(A). West Virginia thus requires providers to tell patients information inconsistent with the REMS.

As for the waiting period, West Virginia requires healthcare providers to wait 24 hours before prescribing mifepristone. *Id.* § 16-2I-2. FDA chose not to impose a waiting period for mifepristone, as it has for other drugs; for example, Isotretinoin's REMS requires patients to take a pregnancy test and then wait at least 19 days before beginning

---

[32] 2023 Mifepristone REMS, *supra* note 2, at 10.

[33] *Id.* at 1-2, 6.

treatment.[34]  FDA's decision not to impose a waiting period for

mifepristone reflects its determination that a waiting period is

unnecessary and would not assure access while minimizing the burdens

on patients and the healthcare delivery system.  21 U.S.C. § 355-1(f).

## II.  THE DISTRICT COURT ERRED IN HOLDING THAT THE FDAAA DOES NOT PREEMPT WEST VIRGINIA'S RESTRICTIONS ON MIFEPRISTONE

### A.  The District Court Erred In Analyzing Field Preemption

#### 1.  The district court misidentified the regulatory field

The court incorrectly identified the regulatory field.  It began by

acknowledging the scope of GenBioPro's argument:  that Congress

occupied the field "specifically as to drugs subject to a REMS which

include[s]" safe-use elements.  JA274.  But it proceeded to analyze a

vastly different field, several orders of magnitude broader:  "health,

medicine, and medical licensure," a "traditional area[] of state

authority."  JA275.  The court relied on the *Wyeth* line of cases to hold

that state action is not preempted "in the field of healthcare or

medicine."  JA275 (discussing *Wyeth v. Levine*, 555 U.S. 555, 581 (2009),

---

[34] Isotretinoin REMS, *supra* note 6, at 1-2.

and *Bartlett*, 570 U.S. at 486-87). And it predicted that the Supreme Court would not treat "the REMS provision" differently from other parts of the FDCA. JA275-276.

That conclusion errs. "[A]lthough the term 'field preemption' suggests a broad scope, the scope of a field deemed preempted by federal law may be narrowly defined." *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999). Congress can preempt state law by determining that certain aspects of regulation are too important to federal objectives to permit state intrusion, while preserving a delineated role for states. Here, by analyzing the field too broadly, the court ignored the many instances in which the federal government has carved out limited areas of a larger field for exclusive federal regulation.

Time and again, Congress occupied limited fields within the broader arena of health and safety, as it did here. *See, e.g.*, *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (safety standards for workers handling hazardous waste); *English*, 496 U.S. at 83 (nuclear safety).

*Locke* illustrates how Congress carves out a sub-field for exclusive regulation. There, the Supreme Court held that federal law preempted

state regulation of oil tanker design and operation, even as it preserved states' role in regulating liability for oil spills. *Locke*, 529 U.S. at 99-100, 108. A savings clause in one federal law "preserve[d]" that "important role" for states. *Id.* at 105-06. But another law provided for "national" regulation of oil tanker design and operation. *Id.* at 110. Federal rules in that limited field "demanded national uniformity." *Id.* at 103. Congress thus "circumscribe[d] its regulation and occup[ied] only a limited field." *Kelly v. Washington ex rel. Foss Co.*, 302 U.S. 1, 10 (1937) (federal law preempted state regulation of steam vessels but not state laws regulating tugboats).

Other instances in which Congress occupied a narrowly drawn field include: claims concerning defective locomotive design within state tort claims, *see Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 637 (2012); regulation of aircraft noise within state noise-control regulations, *see Lockheed*, 411 U.S. at 638; tobacco labeling requirements within general state regulation of goods and services, *see Campbell*, 368 U.S. at 300-01; and the siting of liquefied natural gas facilities within local zoning regulations, *see AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 599-600 (D. Md. 2007).

Regulation of drugs with safe-use elements is one such limited

field.  *See supra* pp.27-31 (Congress occupied field of regulating drugs

with safe-use elements by imposing pervasive regulation in area with

dominant federal interest).  The district court erred in failing to

consider this regime's preemptive effect.

### 2. The district court misconstrued cases addressing state tort claims to define the field

The court erred in relying on *Wyeth* and *Bartlett* for the

proposition that "the FDCA does not preempt state action in the field of

healthcare or medicine" absent a conflict.  JA275-276.  As an initial

matter, those cases involved conflict preemption, not field preemption.

They concerned states' authority to provide remedies through tort law

that parallel federal misbranding duties.  *See Wyeth*, 555 U.S. at 571

(discussing manufacturer's duty to "ensur[e] that its warnings remain

adequate as long as the drug is on the market").

Neither case addresses directly whether states may encroach on

the field of regulating access to drugs subject to REMS with safe-use

elements.  *Bartlett* supports GenBioPro's conflict preemption argument.

*See supra* pp.42-44.  And unlike the state tort remedies in *Wyeth*, the

UCPA does not parallel federal requirements; it purports to override

FDA's determinations.  *See supra* p.47.  The court failed to consider how the UCPA differs, in nature and object, from state tort suits.

If anything, *Wyeth* supports the position that Congress occupied the limited field of regulating drugs with safe-use elements.  In *Wyeth*, the Court held that "common-law tort suits" function "as a complementary form of drug regulation," because FDA had "limited resources to monitor the [then] 11,000 drugs on the market."  555 U.S. at 578.  By contrast, for the 64 drugs subject to REMS with safe-use elements today, Congress determined that *FDA* must monitor changing science and reassess those drugs' safety regulations to minimize specified burdens.  *See supra* pp.29-30.   The court erred in failing to recognize that Congress made this limited field an exclusively federal domain.

In this respect, the scheme is similar to Congress's assumption of exclusive authority to develop "occupational health and safety standards," even as the federal Occupational Safety and Health Act preserves state tort liability.  *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 52 (1st Cir. 1991) (cleaned up).  Congress likewise reserved the field of nuclear safety for exclusive federal regulation, carving out "state tort

laws that traditionally have been available." *English*, 496 U.S. at 83

(emphasis omitted).  As in those cases, Congress's preservation of (non-

conflicting) state law remedies in one part of a statute does not diminish

the preemptive effect of Congress and FDA's comprehensive federal

regime governing mifepristone.

### 3. The district court erroneously distinguished the savings clause in *Locke* and misconstrued the FDCA's 1962 savings clause

The court erred in distinguishing *United States v. Locke* on the

ground that it involved "an area of federal concern," in supposed

contrast to the UCPA occupying an area of longstanding *state*

regulation.  JA276 (discussing *Locke*, 529 U.S. at 99-100).  The court

distinguished the savings clause addressed in *Locke* from one added to

the FDCA via the 1962 Amendments.[35]  Recognizing that the former did

not prevent Congress from occupying "a particular sub-field of an area

of historical federal concern," the court nonetheless held that the

---

[35] This clause states:  "Nothing in the amendments made by this Act . . . shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a direct and positive conflict between such amendments and such provision of State law."  Drug Amendments of 1962, Pub. L. No. 87-781, § 202, 76 Stat. 780, 793 (codified at 21 U.S.C. § 301).

savings clause *Locke* addressed is narrower than the FDCA's. JA277. It based this distinction on "the historical state police powers implicated, and the fact Congress included express preemption provisions in a different amendment to the FDCA." JA277 (citing *Wyeth*, 555 U.S. at 567).

This analysis was error. First, states traditionally did not restrict access to FDA-approved medications subject to safe-use elements. *See infra* pp.71-72. The court failed to recognize that the "particular sub-field" of end-to-end regulations on access to safe-use drugs is an "area of historical federal concern," like oil tanker design. JA277. Indeed, such drugs are a creation of federal law — they are, by definition, drugs that "can be approved only if, or would be withdrawn unless, such elements are required as part of . . . [a REMS]." 21 U.S.C. § 355-1(f)(1)(A).

Second, the 1962 FDCA savings clause does not authorize states to impose restrictions on drugs with REMS featuring safe-use elements. A savings clause does not give states license "to impose additional unique substantive regulation" on the preempted field (here, restrictions on access to prescription drugs regulated with safe-use elements). *Locke*, 529 U.S. at 106; *cf. Morales v. Trans World Airlines,*

*Inc.*, 504 U.S. 374, 385 (1992) (holding that Congress does not "undermine" a "carefully drawn statute through a general saving clause") (quoting *Ouellette*, 479 U.S. at 494). And Congress's inclusion of an express preemption clause in another part of the FDCA cannot be read to extend state authority to regulate in a historically federal arena.

Nor could the 1962 savings clause confer such power on states; it was enacted decades before the FDAAA created the federal regime allowing such drugs to come to market. The clause instead preserves state authority to afford tort remedies to injured parties for violations of duties that parallel drug manufacturers' duties under federal law. *Wyeth*, 555 U.S. at 575, 567; *supra* pp.55-57. The court failed to recognize that *Wyeth* discussed the FDCA's savings clause only in the context of such state tort suits. 555 U.S. at 567-68.

## B. The District Court Erred In Analyzing Conflict Preemption

States are preempted from enforcing rules that "run counter to an exercise of federal authority," and "[federal] regulations are to be given pre-emptive effect over conflicting state laws." *Locke*, 529 U.S. at 109-10. The district court disregarded that constitutional command.

### 1. The district court erred in holding that the FDAAA does not constrain state regulation

The court held that the FDAAA's provisions on "ensuring access and minimizing undue burden" are "plainly a limitation on the FDA's *own restrictions* on a drug, rather than a command that FDA assure access for all patients." JA268. This conclusion misreads the statute, whose words must be "read in their context and with a view to their place in the overall statutory scheme." *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (cleaned up). "[R]easonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (cleaned up).

In the FDAAA, Congress authorized FDA to approve drugs "associated with a serious adverse drug experience" — drugs that otherwise would not be available under the normal regime. 21 U.S.C. § 355-1(f)(1)(A). Imposing a REMS with safe-use elements is what enables FDA to do so, expanding access to essential therapies. *Id.* § 355-1(a)(1). But FDA must ensure that any restrictions it imposes are not "unduly burdensome on patient access." *Id.* § 355-1(f)(5)(B), (C).

60

In this context, allowing states to impose burdens on patients and on the healthcare system interferes with the authority Congress vested in FDA to make determinations about undue burden. *See Ouellette*, 479 U.S. at 494-95 (preemption warranted when state laws interfere with "complex decisions" Congress entrusted to agency); *see also supra* pp.33-34. It would not make sense to say the federal government must be careful not to burden access while allowing states to do so. *Cf. American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 513 (1981) ("[W]e should not 'impute to Congress a purpose to paralyze with one hand what it sought to promote with the other.'") (citation omitted).

### 2. The district court overstated the relevance of *Casey* and *Dobbs*

The court held that the UCPA does not pose an obstacle to Congress's objectives because, when Congress passed the FDAAA, the UCPA would have violated *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992). JA268-269. It held Congress did not intend "to preempt state abortion restrictions which would have been unconstitutional at the time." JA269.

However, the FDAAA's preemptive scope does not depend on patients' then-enshrined right to obtain an abortion. The FDAAA

mandated a uniform system of regulation for a small subset of drugs like mifepristone, with FDA as the sole regulator.  In fulfilling that mandate, Congress directed FDA to minimize burdens on the healthcare delivery system.  *See supra* pp.28-29; 21 U.S.C. § 355-1(f)(2)(D).  Neither *Casey* nor *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) (overturning *Casey*), addressed burdens on that system.  And Congress directed FDA to maximize patient access to these drugs, to the extent practicable.  21 U.S.C. § 355-1(f)(2)(C).  *Dobbs* did not and could not alter or supersede Congress's determination in the FDAAA that FDA must ensure drugs like mifepristone are accessible.

The court ignored basic principles of statutory construction in surmising what members of Congress were thinking when they enacted the FDAAA, without citing legislative history.  *E.g.*, JA268.  The starting point is "the plain text of the provision."  *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 356 (4th Cir. 2020) (citing *Marx v. General Revenue Corp.*, 568 U.S. 371, 376 (2013)).  Here, that text instructs FDA to minimize burdens on patients' access to mifepristone, irrespective of *Casey*.  *Bostock v. Clayton Cnty.*, 140 S. Ct.

1731, 1738 (2020) ("[O]nly the words on the page constitute the law adopted by Congress.").

The court further erred in reasoning that *Dobbs* "made it clear that regulating abortion is a matter of health and safety upon which States may appropriately exercise their police power."  JA265.  *Dobbs* did not purport to alter the federal government's role in regulating mifepristone and other drugs subject to the strictures of a REMS with safe-use elements under the FDAAA.  Rather, it held that "authority to regulate abortion must be returned to the people and their elected representatives."  597 U.S. at 292.  Those representatives include Congress, which entrusted FDA with regulating certain drugs, including medications indicated for medication abortion.

### 3. The district court drew an untenable distinction between regulating "when" and "how" patients receive mifepristone

The court held that state and federal law do not conflict because the UCPA limits "*when* an abortion may be performed, without touching *how* medication abortion is to be performed," while "[t]he mifepristone REMS only concern themselves with the latter."  JA273; *see* JA272, JA273 n.12 (characterizing UCPA as "a restriction on the

incidence of abortion" and REMS as merely "logistical safety standards").  This distinction does not bear scrutiny.

First, the REMS are not just "logistical."  JA273 n.12; *see supra* pp.8-11, 30.  They are comprehensive, postmarket rules governing a drug's approval, prescribing, distribution, dispensing, packaging, accessibility to certain patient groups, and even disposal.[36]

Second, mifepristone's REMS governs not only "how" patients may obtain mifepristone, but which patients may access it, where, and under what circumstances.  *See supra* pp.8-11, 30.  West Virginia's restrictions, too, regulate "how" medication abortion occurs.  Like the REMS, they delineate who can obtain mifepristone, when they may do so, what providers must tell patients prior to providing mifepristone, and what forms patients must sign to obtain the drug.  They regulate in the same arena as the REMS and "run[] smack into the [FDA's] regulations."  *National Meat Ass'n v. Harris*, 565 U.S. 452, 467 (2012).

---

[36] *See, e.g.*, 2023 Mifepristone REMS, *supra* note 2, at 6-9 (listing requirements for healthcare providers to become certified to prescribe mifepristone and instructing how to dispense the medication); *id.* at 11-13 (instructing pharmacists dispensing mifepristone and requiring pharmacists to track medication shipments).

The court correctly recognized that the FDAAA preempted West Virginia's telemedicine ban by "dictat[ing] the manner in which mifepristone may be prescribed." JA278. FDA permitted healthcare providers to use telemedicine to prescribe mifepristone, but West Virginia did not, resulting in "impossibility preemption." JA278.

The court misunderstood that, similarly, under the UCPA, practitioners, pharmacies, and other participants in the healthcare delivery system cannot "comply with both the access determination made by the FDA and the access determination made by West Virginia," which bans mifepristone in almost all circumstances. JA278; *see supra* pp.42-44.

### 4. The district court misread which entities the UCPA regulates

The court erred in holding that GenBioPro "is not regulated by the UCPA *at all*" and that the UCPA regulates only "licensed medical professionals." JA270-271. On the contrary, the UCPA makes it impossible for GenBioPro to provide mifepristone in accordance with the REMS, other than to "stop selling" it in almost all circumstances. *Bartlett*, 570 U.S. at 487 n.3; *see supra* pp.42-44.

First, the UCPA regulates *anyone* who performs an abortion. "[L]icensed medical professional[s]" face professional penalties for violating the law, and any *other* "person" who does so commits a felony. W. Va. Code §§ 16-2R-7, 61-2-8(a); *see supra* p.15 (explaining that UCPA subjects advanced practice registered nurses and physician assistants to criminal penalties for prescribing mifepristone to most patients).

Furthermore, the UCPA regulates GenBioPro directly through section 16-2R-2's sweeping definition of "[a]ttempt to perform or induce an abortion." *See supra* pp.15-16. That includes any act that "constitutes a substantial step in a course of conduct intended to culminate in an abortion," arguably including selling mifepristone to providers and pharmacies. W. Va. Code § 16-2R-2.

The phrase "unless in the reasonable medical judgment of a licensed medical professional" in section 16-2R-3(a) does not limit the core prohibition to such professionals. It merely prohibits anyone from performing an abortion and limits the prohibition's *exception* to the judgment of a licensed medical professional.

Even if the UCPA regulated only prescribers, and not GenBioPro, this would not save the state law from preemption. In *Engine*

*Manufacturers Ass'n v. South Coast Air Quality Management District*,

the Supreme Court held that "a standard is a standard" for purposes of

determining whether it conflicts with a federal rule, "even when not

enforced through manufacturer-directed regulation." 541 U.S. 246, 254

(2004).

In *National Meat*, the Court held that California could not avoid

preemption of state manufacturing standards by framing its law as a

sales ban. 565 U.S. at 464. To hold otherwise "would make a mockery

of the [Act's] preemption provision." *Id.* Similarly, the Court rejected

North Carolina's attempt to "evade" preemption by adopting a "creative

statutory interpretation" at "odds with the [state] statute's intended

operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636

(2013); *see also PPL EnergyPlus*, 753 F.3d at 476 ("[S]tates are barred

from relying on mere formal distinctions in an attempt to evade

preemption.") (cleaned up).

Although GenBioPro can avoid this conflict (and associated risk of

criminal penalties) by not providing mifepristone in West Virginia, the

"ability to stop selling does not turn impossibility into possibility."

*Bartlett*, 570 U.S. at 487 n.3. Indeed, the court recognized this and

rejected Appellees' argument that "GenBioPro may simply choose to stop selling mifepristone in West Virginia," JA271 n.10 (citing *Bartlett*, 570 U.S. at 488), but erred in holding that the UCPA does not regulate GenBioPro in the first place.

### 5. Neither *Virginia Uranium* nor *National Meat* supports the district court's preemption holding

The court highlighted two cases in analyzing conflict preemption; neither supports its conclusion.

**a.** The district court erroneously read *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894 (2019), as holding that a state may "disallow uranium mining" because such mining is "an area of authority traditionally left to the States." JA273. The Supreme Court said no such thing. There, uranium mining companies sued to enjoin a Virginia law banning uranium mining on private land as preempted by the federal Atomic Energy Act. In a fractured opinion, the Court found no preemption because "[t]he Federal Government does not regulate conventional uranium mining on private land." 139 S. Ct. at 1910 (Ginsburg, J., concurring in judgment) (citation omitted); *see id.* at 1900 (plurality op. of Gorsuch, J.) (same).

The Atomic Energy Act addresses only what happens to uranium "*after*" it is removed from the earth and is silent on regulating mining, unless that mining occurs on federal land. *Id.* at 1901-02. Thus, "the activity Virginia's law regulates . . . isn't one [federal law] has ever addressed." *Id.* at 1904. In contrast, federal law regulates mifepristone's availability to patients from manufacturing to prescription and dispensing.

**b.** The district court relied on *National Meat*, but that case supports reversal. *See* JA273. *National Meat* concerned the preemptive effect of the Federal Meat Inspection Act, which regulates all aspects of "slaughterhouses' handling and treatment of nonambulatory pigs from the moment of their delivery through the end of the meat production process." 565 U.S. at 468. It thus preempted a state law dictating what slaughterhouses must do when pigs cannot stand on their own. Likewise, here, FDA may regulate all aspects of drugs subject to a REMS with safe-use elements, from their manufacture, to prescription, to dispensing, to use, to disposal. *See supra* pp.8-11. State law cannot intrude.

The court cited dicta in *National Meat* discussing "Circuit decisions upholding state bans on slaughtering horses." 565 U.S. at 467; JA273 n.11. The Supreme Court described those state bans as "work[ing] at a remove from" the arena federal law governed, because the bans prevent horses from being in slaughterhouses at all. 565 U.S. at 467. But the federal statute there did not impose a mandate to minimize burdens on access to horsemeat, and horse-slaughter bans only incidentally relate to the federal meat inspection statute.

The UCPA, by contrast, conflicts with FDA's mandate to ensure restrictions on REMS drugs with safe-use elements preserve "patient access." 21 U.S.C. § 355-1(f)(2)(C). The FDAAA requires FDA to ensure mifepristone is as accessible as it determines is (safely) possible to patients with "serious or life-threatening . . . conditions," including pregnancy. *Id.* § 355-1(f)(2)(C)(i). Dicta in *National Meat* therefore is inapt.

## C. The District Court Erred In Applying A Presumption Against Preemption

A presumption against preemption applies to arenas "which the States have traditionally occupied." *Buckman*, 531 U.S. at 347 (cleaned up); *see Zimmerman v. Novartis Pharms. Corp.*, 889 F. Supp. 2d 757,

766 (D. Md. 2012). No such presumption applies here, and the district court erred in holding otherwise based on its misidentification of the challenged arena as "health, medicine, and medical licensure." JA275.

### 1. States do not traditionally restrict access to drugs with safe-use elements

The district court erred by applying a presumption against preemption in an arena "traditionally regulated by the federal government." *South Carolina*, 720 F.3d at 529. Such a presumption does not apply when, as here, "there has been a history of significant federal presence" and "considerable federal interest[s]" are at stake. *Locke*, 529 U.S. at 90-91, 94. "Although health care in general is an area of traditional state regulation," when a "dispute concerns" matters "that arise from a federal law," "'distinctly federal interests are involved.'" *Bell v. Blue Cross & Blue Shield of Okla.*, 823 F.3d 1198, 1201-02 (8th Cir. 2016) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 696 (2006)).

Federal, not state, law governs access to FDA-approved drugs subject to safe-use elements. While states regulate aspects of medical and pharmacy practice with regulations of general applicability, like licensing standards, they do not approve drugs or impose REMS. Even

71

when "responsibility for regulating" a broad arena "remains primarily with the States," "the Constitution does not erect a firewall around" that arena, and Congress may preempt state law by "validly legislating pursuant to its Article I powers." *Haaland v. Brackeen*, 599 U.S. 255, 276-77 (2023).

The court failed to recognize that the UCPA is unlike state tort remedies that parallel federal duties. It departs from traditional state regulation by prohibiting access to an FDA-approved drug subject to its own detailed set of restrictions. *See supra* pp.46-47. In that situation, no presumption against preemption applies. *See Amgen*, 877 F.3d at 1327 ("[N]o presumption . . . applies" because biosimilar patent litigation "is hardly a field which the States have traditionally occupied.") (cleaned up).

## 2. No presumption applies because the FDAAA's regulatory regime is comprehensive

Finally, no presumption against preemption applies when federal law propounds comprehensive regulation. *See Kelly*, 302 U.S. at 4; *Ray*, 435 U.S. at 166 n.15.[37] The FDAAA's end-to-end regulation of

---

[37] In any event, the district court pointed to no case rejecting preemption based solely on such a presumption. *Cf. Zimmerman*, 889

mifepristone and other drugs with safe-use elements is highly

reticulated.  *See supra* pp.27-31.  In the context of such a detailed

regime, it is inappropriate to begin with a presumption against

preemption, rather than giving the federal regulatory regime full,

national force.  *See Locke*, 529 U.S. at 103 (discussing "longstanding

rule that the enactment of a uniform federal scheme displaces state

law").

## CONCLUSION

The district court's judgment should be reversed.


## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument.

---

F. Supp. 2d at 772 (describing the presumption as "hardly outcome-
determinative").

February 7, 2024

Respectfully submitted,

/s/ David C. Frederick

David C. Frederick
Ariela M. Migdal
Derek C. Reinbold
Eliana Margo Pfeffer
Mary Charlotte Y. Carroll
Abigail E. DeHart
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036 (202)
326-7900
dfrederick@kellogghansen.com
amigdal@kellogghansen.com
dreinbold@kellogghansen.com
epfeffer@kellogghansen.com
mcarroll@kellogghansen.com
adehart@kellogghansen.com

Skye L. Perryman
Carrie Y. Flaxman
DEMOCRACY FORWARD
  FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
sperryman@democracyforward.org
cflaxman@democracyforward.org

John P. Elwood
Daphne O'Connor
Robert J. Katerberg
ARNOLD & PORTER KAYE
  SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 942-5000
john.elwood@arnoldporter.com
daphne.oconnor@arnoldporter.com
robert.katerberg@arnoldporter.com

Counsel for GenBioPro, Inc.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 23-2194     **Caption:** GenBioPro, Inc. v. Kristina Raynes et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- [✓] this brief or other document contains ____12,845____ [*state number of*] words

- [ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- [✓] this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016_____ [*identify word processing program*] in 14 point, Century Schoolbook_____ [*identify font size and type style*]; **or**

- [ ] this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) David C. Frederick_____

Party Name GenBioPro, Inc._____

Dated: Feb. 7, 2024_____

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 7, 2024, I electronically filed the foregoing Brief for Plaintiff-Appellant GenBioPro, Inc. with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ David C. Frederick
David C. Frederick