# In the United States Court of Appeals for the Fourth Circuit

GENBIOPRO, INC.,
*Plaintiff-Appellant*

v.

KRISTINA RAYNES, in her official capacity as Prosecuting Attorney of Putnam County; PATRICK MORRISEY, in his official capacity as Attorney General of West Virginia,
*Defendants-Appellees*

and

MARK A. SORSAIA, in his official capacity
as Prosecuting Attorney of Putnam County,
*Defendant*

On Appeal from the United States District Court for the Southern District of West Virginia at Huntington, Honorable Robert C. Chambers, U.S. District Court Judge
Civil Action No. 3:23-cv-00058

## BRIEF FOR *AMICUS CURIAE* INSTITUTE FOR FAITH & FAMILY IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554
lawyerdeborah@outlook.com
*Counsel for Amicus Curiae*

**DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS FRAP RULE 26.1 and LOCAL RULE 26.1**

*Amicus curiae*, Institute for Faith & Family, a nonprofit corporation, makes the following disclosures:

1. *Amicus* is not a publicly held corporation or other public entity.

2. *Amicus* does not have a parent corporation.

3. No publicly held corporation or other publicly held entity owns 10% or more of the stock of *amicus*, because it is a nonprofit corporation and does not issue stock.

4. No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

DATED:     April 11, 2024                          /s/Deborah J. Dewart_____
                                                            Deborah J. Dewart
                                                            Counsel for *Amicus Curiae*
                                                            *Institute for Faith & Family*

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS FRAP RULE 26.1 and LOCAL RULE 26.1 ................................................... i

TABLE OF AUTHORITIES ................................................................... iv

INTEREST OF *AMICUS CURIAE* .......................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 1

ARGUMENT ....................................................................................... 4

I.    THIS NATION HAS A LONG TRADITION OF RESPECT FOR RELIGION AND CONSCIENCE.................................................. 4

    A.    Respect for individual conscience is deeply rooted in American history. ................................................................... 5

    B.    Federal law has long respected the conscience rights of both patients and health care professionals. ................................. 7

    C.    States provide broad constitutional and statutory protection for liberty of conscience.......................................... 10

    D.    This case implicates *conscientious objectors*—not civil disobedience. ........................................................ 14

II.    LEGISLATION MAY NOT PREEMPT OUR *FIRST* LIBERTY: RELIGIOUS FREEDOM. ............................................................ 16

    A.    Abortion is a highly controversial, divisive issue. .............. 17

    B.    Liberty of religion and conscience should not be dismantled to compel individual doctors to perform abortions. ................ 18

    C.    Accommodation of a medical professional's conscience does not threaten any person's fundamental rights. ......................... 19

III.    COERCED PARTICIPATION IN ABORTION DEMONSTRATES HOSTILITY TO RELIGIOUS LIBERTY AND CONSCIENCE. .............. 19

    A.    Conscience protection is particularly urgent where human life is at stake. .................................................................................................... 20

    B.    Even in the commercial sphere, believers do not forfeit their constitutional rights. .......................................................................... 22

IV.    THE GOVERNMENT COULC NOT SATISFY THE DEMANDING "COMPELLING INTEREST" OR "LEAST RESTRICTIVE MEANS" PRONGS OF RFRA. .................................................................................. 24

    A.    The government could not satisfy the compelling interest prong. ...... 26

    B.    The government could not satisfy the least restrictive means prong. 27

CONCLUSION ...................................................................................................... 27

CERTIFICATE OF COMPLIANCE ..................................................................... 29

CERTIFICATE OF SERVICE ............................................................................... 30

# TABLE OF AUTHORITIES

## CASES

*Attorney Gen. v. Desilets*,
    636 N.E.2d 233 (Mass. 1994) ........................................................................... 23

*Baird v. State Bar of Arizona*,
    401 U.S. 1 (1971) ............................................................................................ 20

*Braunfeld v. Brown*,
    366 U.S. 599 (1961) ......................................................................................... 23

*Brown v. Entertainment Merchants Association*,
    131 S. Ct. 2729 (2011) ..................................................................................... 27

*Bryant v. Stein*,
    No. 1:23-cv-00077 (M.D.N.C.) ........................................................................ 1

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) .................................................................................. 25, 27

*Catholic Charities of Sacramento, Inc. v. Superior Court*,
    85 P.3d 67 (Cal. 2004) .............................................................................. 23, 24

*Coulee Catholic Sch. v. Labor & Indus. Review Comm'n*,
    768 N.W.2d 868 (Wis. 2009) .................................................................... 13, 14

*Dobbs v. Jackson Women's Health Organization*,
    142 S. Ct. 2228 (2022) .................................................................. 1, 2, 17, 19

*Doe v. Bolton*,
    410 U.S. 179 (1973) .................................................................................. 16, 17

*E. Tex. Baptist Univ. v. Burwell*,
    807 F.3d 630 (5th Cir. 2015) ..................................................................... 4, 10

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) ......................................................................................... 16

iv

*Emp't Div., Ore. Dep't of Human Res. v. Smith*,
    494 U.S. 872 (1990)................................................................ 15

*Everson v. Bd. of Educ. of Ewing*,
    330 U.S. 1 (1947)................................................................ 20

*First Covenant Church v. City of Seattle*,
    840 P.2d 174 (Wash. 1992) ................................................ 13

*Frank v. State*,
    604 P.2d 1068 (Alaska 1979) ............................................ 13

*GenBioPro v. Sorsaia*,
    2023 U.S. Dist. LEXIS 149195 (S.D. W. Va. Aug. 24, 2023)...................... 2, 3

*Girouard v. United States*,
    328 U.S. 61 (1946)................................................ 4, 15, 18

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006)................................................ 26

*Griswold v. Connecticut*,
    381 U.S. 479 (1965)................................................ 16

*Guaranteed Auto Fin., Inc. v. Dir., ESD*,
    92 Ark. App. 295 (2005)................................................ 13

*Harden v. State*,
    216 S.W.2d 708 (Tenn. 1948) ........................................ 13

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*,
    471 U.S. 707 (1985)................................................ 3

*Humphrey v. Lane*,
    728 N.E.2d 1039 (Ohio 2000) ........................................ 13

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995)................................................ 18

*In re Williams*,
 152 S.E.2d 317 (N.C. 1967) ............................................................. 13

*Keyishian v. Bd. of Regents*,
 385 U.S. 589 (1967) ......................................................................... 20

*Lee v. Weisman*,
 505 U.S. 577 (1992) ...................................................................... 4, 20

*Little Sisters of the Poor v. Pennsylvania*,
 140 S. Ct. 2367 (2020) ........................................................ 24, 25, 26

*Lynch v. Donnelly*,
 465 U.S. 668 (1984) ......................................................................... 20

*Priests for Life v. United States HHS*,
 808 F.3d 1 (D.C. Cir. 2015) ............................................................... 6

*Prince v. Massachusetts*,
 321 U.S. 158 (1944) ......................................................................... 15

*Rasmussen v. Glass*,
 498 N.W.2d 508 (Minn. Ct. App. 1993) ..................................... 13, 23

*Roe v. Wade*,
 410 U.S. 113 (1973) .......................................................... 3, 8, 16, 17

*Schelske v. Austin*,
 649 F.Supp. 3d 254 (N.D. Tex. 2022) ............................................... 5

*Sherbert v. Verner*,
 374 U.S. 398 (1963) .............................................................. 15, 23, 26

*State ex rel. McClure v. Sports & Health Club, Inc.*,
 370 N.W.2d 844 (Minn. 1985) ........................................................ 23

*Stormans, Inc. v. Wiseman*,
 794 F.3d 1064 (9th Cir. 2015) .................................................... 21, 22

*Stormans, Inc. v. Wiesman*,
  136 S. Ct. 2433 (2016) ...................................................... 22

*Swanner v. Anchorage Equal Rights Comm'n*,
  874 P.2d 274 (Alaska 1994) ............................................ 23

*Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) ............................................ 2

*Thomas v. Collins*,
  323 U.S. 516 (1945) ......................................................... 26

*Thomas v. Review Bd. of Indiana Employment Security Div.*,
  450 U.S. 707 (1981) ......................................................... 25

*Tony and Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 290 (1985) ......................................................... 23

*United States v. Idaho*,
  83 F.4th 1130 (9th Cir. 2023) .......................................... 2

*United States v. Lee*,
  455 U.S. 252 (1982) .................................................... 23, 24

*United States v. Seeger*,
  380 U.S. 163 (1965) ....................................................... 3, 7

*Washington v. Glucksberg*,
  521 U.S. 701 (1997) ......................................................... 19

*Welsh v. United States*,
  398 U.S. 333 (1970) ......................................................... 21

*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) .................................................... 15, 18

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972) ......................................................... 15

*Wooley v. Maynard,*
430 U.S. 705 (1977) ........................................................................... 18

*Zorach v. Clauson,*
343 U.S. 306 (1952) ........................................................................... 20

## STATUTES - FEDERAL

42 U.S.C. §§1395w-22(j)(3)(B), 1396u-2(b)(3)(B)
("Medicare and Medicaid Conscience Clause Provisions") ................. 9

42 U.S.C. § 238n (the "Coats-Snowe Amendment") ............................... 9

42 U.S.C. § 300a-7(c) (the "Church Amendment") ........................... 9, 10

42 U.S.C. § 1395dd (Emergency Medical Treatment & Labor Act) ....... 2

42 U.S.C. § 2000bb *et seq.* (Religious Freedom Restoration Act of 1993)
("RFRA") ................................................................... 24, 25, 26

## STATUTES - STATE

Ariz. Rev. Stat. Ann. § 36-3205(C)(1) ................................................. 12

Ark. Code Ann. § 20-6-109(b) .............................................................. 12

Conn. Gen. Stat. § 19a-131e(b) ............................................................. 12

Fla. Stat. § 381.00315(1)(c)(4) ............................................................. 12

Ga. Crim. Code § 26-1202(e) (1968) ..................................................... 17

Idaho Code § 18-611(b) ......................................................................... 12

745 Ill. Comp. Stat. 70/3(e) .................................................................. 12

La. Rev. Stat. Ann. §§ 40:1061.20(A)(1), (B)(1) .................................. 12

Miss. Code Ann. § 41-107-3(h) .................................................... 12

N.M. Stat. Ann. §§ 12-10A-13(D)(3), 24-7A-7(E) ................................. 12

18 Pa. Cons. Stat. §§ 3202(d), 3203 ....................................... 12

R.I. Gen. Laws § 23-8-4 ....................................................... 12

S.C. Code Ann. § 44-4-520(A)(3) ............................................ 12

Tenn. Code Ann. §§32-11-108(a), 68-11-1808(d)(1)............................ 12

Tex. Educ. Code Ann. §§38.001(c)(1)(B), 51.933(d)(1)(B) .................. 12

12 Va. Admin. Code § 30-20-240(5)......................................... 12

Wash. Rev. Code Ann. §§70.245.010, 70.245.190
(Washington Death With Dignity Act).................................. 21

Wash. Admin. Code § 246-863-095 (2017)
(Pharmacist Responsibility Rule) ...................................... 21

Wash. Admin. Code § 246-869-010(1) (2017) (Delivery Rule) ............ 21

W. Va. Code § 16-2R-1 *et seq.* (Unborn Child Protection Act ("UCPA"))......... 1, 2

## CONSTITUTIONAL PROVISIONS

Alabama Const. Art. I, Sec. 4 ............................................. 11

A.R.S. Const. Art. II, § 12 ............................................... 10

Alaska Const. Art. I, § 4 ................................................. 11

Ark. Const. Art. 2, § 24.................................................. 10

Cal. Const. art. I, § 4 ................................................... 10

Colo. Const. Art. II, Section 4 .......................................... 10

Conn. Const. Art. I., Sec. 3 ...................................................................... 11

Del. Const. art I, § 1 ............................................................................... 10

Fla. Const. Art. I, § 3 .............................................................................. 11

Ga. Const. Art. I, § I, Para. III-IV ...................................................... 10, 11

HRS Const. Art. I, § 4 ............................................................................ 11

Idaho Const. Art. I, § 4 ........................................................................... 11

Illinois Const., Art. I, § 3 ........................................................................ 11

Ind. Const. Art. 1, §§ 2, 3 ....................................................................... 11

Iowa Const. Art. I, § 3 ............................................................................ 11

Kan. Const. B. of R. § 7 .......................................................................... 11

Ky. Const. § 1 ......................................................................................... 11

La. Const. Art. I, § 8 ............................................................................... 11

ALM Constitution Appx. Pt. 1, Art. II ................................................... 11

Me. Const. Art. I, § 3 .............................................................................. 11

Md. Dec. of R. art. 36 ............................................................................. 11

MCLS Const. Art. I, § 4 .......................................................................... 11

Minn. Const. art. 1, § 16 ......................................................................... 11

Miss. Const. Ann. Art. 3, § 18 ................................................................ 11

Mo. Const. Art. I, § 5 ............................................................................. 11

Mont. Const., Art. II § 5 ......................................................................... 11

Ne. Const. Art. I, § 4 ................................................................. 11

Nev. Const. Art. 1, § 4 ............................................................... 11

N.H. Const. Pt. FIRST, Art. 4 and Art. 5 .................................. 11

N.J. Const., Art. I, Para. 3 ......................................................... 11

N.M. Const. Art. II, § 11 ........................................................... 11

NY CLS Const Art I, § 3 ............................................................ 11

N.C. Const. art. I, § 13 .............................................................. 11

N.D. Const. Art. I, § 3 ............................................................... 11

Oh. Const. art. I, § 7 ................................................................. 11

Okl. Const. Art. I, § 2 ................................................................ 11

Ore. Const. Art. I, §§ 2, 3 ......................................................... 11

Pa. Const. Art. I, § 3 ................................................................. 11

R.I. Const. Art. I, § 3 ................................................................ 11

S.C. Const. Ann. Art. I, § 2 ....................................................... 11

S.D. Const. Article VI, § 3 ......................................................... 11

Tenn. Const. Art. I, § 3 ............................................................. 11

Tex. Const. Art. I, § 6 ............................................................... 11

Utah Const. Art. I, § 4 .............................................................. 11

Vt. Const. Ch. I, Art. 3 ............................................................. 11

Va. Const. Art. I, § 16 .............................................................. 11

Wash. Const. art. 1, § 11 ........................................................ 11

W. Va. Const. Art. III, § 15 .................................................... 11

Wis. Const. Art. I, § 18 .......................................................... 11

Wyo. Const. Art. 1, § 18 ......................................................... 11

## OTHER AUTHORITIES

1 ANNALS OF CONG. 451 (1789) (Joseph Gales ed., 1834) ................................. 5

119 Cong. Rec. 9595 (1973) .................................................... 9

P.L. 94-439, § 209 ............................................................. 9

Sen. Rep. No. 103-111, 1st Sess., p. 4 (1993), reprinted in 1993 U.S. Code
    Cong. & Admin. News ...................................................... 18

Helen Alvaré, *No Compelling Interest:*
    *The "Birth Control" Mandate and Religious Freedom*,
    58 Vill. L. Rev. 379 (2013) ................................................ 27

J. David Bleich, *The Physician as a Conscientious Objector*, 30 Fordham
    Urb. L. J. 245 (2002) ...................................................... 8

Zachary R. Carstens, *The Right to Conscience vs. The Right to Die: Physician-
Assisted Suicide, Catholic Hospitals, and the Rising Threat to Institutional Free
Exercise in Healthcare*,
    48 Pepp. L. Rev. 175 (2021) ..................................... 5, 9, 21

Nathan S. Chapman, *Disentangling Conscience and Religion,*
    2013 U. Ill. L. Rev. 1457 ..................................... 6, 8, 12, 22

Lucien J. Dhooge, *The Equivalence of Religion and Conscience,*
    31 ND J. L. Ethics & Pub Pol'y 253 (2017) ..................... 11, 12, 14

Letter from George Washington to Colonel Benedict Arnold
    (Sept. 14, 1775), *in* THE PAPERS OF GEORGE WASHINGTON,
    1 REVOLUTIONARY WAR SERIES 455-56 (1985) ................................................... 5

James Madison, *Memorial and Remonstrance Against Religious Assessments*,
    reprinted in 2 WRITINGS OF JAMES MADISON 183 (G. Hunt ed. 1901) ........... 6, 7

James Madison, *Political Essay: Property*, NAT'L GAZETTE,
Mar. 29, 1792, *reprinted in* SELECTED WRITINGS OF JAMES MADISON 223
    (Ralph Ketcham ed. 2006) .............................................................................. 5, 6

Jared B. Magnuson, *Let Your Conscience Be Your Guide: Comparing and
Contrasting Washington's Death With Dignity Act and Pharmacy Regulations After
the Ninth Circuit's Decision in* Stormans, Inc. v. Wiseman,
    52 Ga. L. Rev. 613 (Winter 2018) ................................................. 8, 9, 10, 21, 22

Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom
    of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163 ..................... 18, 23

Michael W. McConnell, *The Origins and Historical Understanding of Free
    Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) ......................................... 6

Courtney Miller, Note: *Reflections on Protecting Conscience for Health
    Care Providers: A Call for More Inclusive Statutory Protection in Light
    of Constitutional Considerations*,
    15 S. Cal. Rev. L. & Social Justice 327 (2006) ............................................ 9, 10

Nora O'Callaghan, *Lessons From Pharaoh and the Hebrew Midwives:
    Conscientious Objection to State Mandates as a Free Exercise Right*,
    39 Creighton L. Rev. 561 (2006) ................................. 8, 9, 15, 16, 17, 19, 22, 23

Thomas Paine, The Rights of Man, 65 (Ernest Rhys ed., 1791) ............................. 6

S. JOURNAL, 1ST CONGRESS, 1ST SESS. 63 (1789) ........................................ 5

Brett G. Scharffs, *Why Religious Freedom? Why the Religiously Committed, the
Religiously Indifferent, and Those Hostile to Religion Should Care*,
    2017 B.Y.U.L. Rev. 957 ...................................................................................... 6

Steven D. Smith, *What Does Religion Have to Do with Freedom of Conscience*?,
76 U. Colo. L. Rev. 911 (2005) ............................................................ 14

Harlan Fiske Stone, *The Conscientious Objector*,
21 Col. Univ. Q. 253 (1919) .................................................... 3, 4, 7

https://www.consciencelaws.org/law/laws/usa.aspx#state .................................. 10

hhttps://crsreports.congress.gov/product/pdf/IF/IF12167 ........................................ 9

# INTEREST OF AMICUS CURIAE[1]

The Institute for Faith and Family, as *amicus curiae*, urges this Court to reverse the decision of the Ninth Circuit.

The Institute for Faith and Family ("IFF") is a North Carolina nonprofit corporation established to preserve and promote faith, family, and freedom by working in various arenas of public policy to protect constitutional liberties, including the right to life. See https://iffnc.com. A similar challenge to North Carolina's pro-life laws is currently pending summary judgment and, if appealed, would also be heard by the Fourth Circuit. *Bryant v. Stein*, No. 1:23-cv-00077 (M.D.N.C.).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Supreme Court has unequivocally returned abortion regulation to the elected representatives of the people. *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2243 (2022). Following *Dobbs*, the State of West Virginia exercised its newly recognized regulatory authority in September 2022 by enacting the Unborn Child Protection Act ("UCPA"). W. Va. Code § 16-2R-1 *et seq.* There are only limited exceptions to the UCPA's prohibition on "performing,

---

[1] *Amicus curiae* submits this brief with the consent of the parties and certifies that no counsel for a party authored this brief in whole or in part and no person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to its preparation or submission.

inducing, or attempting to perform or induce an abortion," including abortions induced by drugs like mifepristone. W. Va. Code § 16-2R-2.

The plaintiff in this case, GenBioPro, Inc. ("GenBioPro") is the sole manufacturer of generic mifepristone in the United States. *GenBioPro v. Sorsaia*, 2023 U.S. Dist. LEXIS 149195 (S.D. W. Va. Aug. 24, 2023), *3. But this is not the first case where abortion proponents have appealed to federal law to circumvent state law restrictions on abortion. Opponents of similar state laws have cited alleged conflicts with federal law, such as the Emergency Medical Treatment & Labor Act (EMTALA), 42 U.S.C. § 1395dd. *Texas v. Becerra*, 89 F.4th 529 (5th Cir. 2024); *United States v. Idaho*, 83 F.4th 1130 (9th Cir. 2023). In those two cases, no conflict existed. "The text of EMTALA shows that it does not require hospitals to perform abortions." *United States v. Idaho*, 83 F.4th at 1135. The difficulty arose from flawed Guidance issued by the Department of Health and Human Services ("HHS"), demanding that providers perform abortions regardless of state law and directly contrary to EMTALA's statutory requirement to consider the welfare of an unborn child when stabilizing a pregnant woman. This was a brazen end-run around *Dobbs*. Here, the district court found that "GenBioPro is not regulated by the UCPA *at all*"—the law regulates only "licensed medical professionals," and GenBioPro does not fall within that category. *GenBioPro*, at *25-26. The district court found no basis for preemption.

2

Moreover, "health and safety is a field that States have traditionally occupied." *GenBioPro*, at \*18, citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716 (1985); *id.* at \*31, \*40. States use their police power "to regulate public health and morality," including "morality-based laws" that "curtail the sale of goods." *GenBioPro*, at \*49. With *Roe v. Wade,* 410 U.S. 113 (1973) now overruled, states may freely regulate abortion.

While states tighten restrictions on abortion, "the FDA has continually eased restrictions on access to mifepristone." *GenBioPro*, at \*5. This increases the risk that women will seek emergency care, forcing doctors to complete their abortions. *Amicus curiae* writes to highlight the massive challenges imposed on conscientious objectors that should be factored into the analysis. Federal law does not trump the Constitution nor does it preempt a state's pro-life legislation. The Constitution's broad guarantees for religious liberty and conscience extend to medical professionals who wish to conduct business with integrity, consistent with conscience, ethics, and religious faith. Not everyone shares those values, but the threat to eliminate conscience from the medical profession is a frightening prospect for patients, doctors, and other medical personnel.

"All our history gives confirmation to the view that liberty of conscience has a moral and social value which makes it worthy of preservation at the hands of the state." *United States v. Seeger*, 380 U.S. 163, 170 (1965), quoting Harlan Fiske

Stone, *The Conscientious Objector*, 21 Col. Univ. Q. 253, 269 (1919). Coerced participation in abortion attacks liberties Americans have treasured for over 200 years. It is anathema to the basic First Amendment principle that the government may not coerce its citizens to endorse or support a cause. The potential injury here is particularly insidious, forcing conscientious objectors to personally participate in a morally objectionable procedure—abortion.

**ARGUMENT**

## I. THIS NATION HAS A LONG TRADITION OF RESPECT FOR RELIGION AND CONSCIENCE.

The free exercise of religion is inescapably intertwined with conscience. The victory for freedom of thought recorded in the Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State. *Girouard v. United States,* 328 U.S. 61, 68 (1946). Courts have an affirmative "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. 577, 592 (1992).

Liberty of conscience has deep roots in American history. "Conscience is the essence of a moral person's identity. . . . Liberty of conscience was the foundation for Madison's and Jefferson's and other Framers' views underlying the First Amendment's religion clauses." *E. Tex. Baptist Univ. v. Burwell*, 807 F.3d 630, 635 (5th Cir. 2015) (Jones, J., dissenting from denial of Petition for Rehearing En Banc.) Our first commander in chief cautioned that "[w]hile we are Contending for our own

4

Liberty, we should be very cautious of violating the Rights of Conscience in others." Letter from George Washington to Colonel Benedict Arnold (Sept. 14, 1775), *in* THE PAPERS OF GEORGE WASHINGTON, 1 REVOLUTIONARY WAR SERIES 455-56 (1985). *Schelske v. Austin*, 649 F.Supp. 3d 254, 292 (N.D. Tex. 2022).

### A. Respect for individual conscience is deeply rooted in American history.

The initial draft of the First Amendment, sent by the House of Representatives to the Senate, included a "Conscience Clause" in addition to the now familiar Free Exercise and Establishment Clauses. Zachary R. Carstens, *The Right to Conscience vs. The Right to Die: Physician-Assisted Suicide, Catholic Hospitals, and the Rising Threat to Institutional Free Exercise in Healthcare*, 48 Pepp. L. Rev. 175, 179 n. 9 (2021), citing S. JOURNAL, 1ST CONGRESS, 1ST SESS. 63 (1789) (emphasis added). Madison's proposed addition to the text read as follows:

> That in article 1st, section 9, between clauses 3 and 4, be inserted these clauses, to wit: The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, *nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed*.

*Ibid* (emphasis added), citing 1 ANNALS OF CONG. 451 (1789) (Joseph Gales ed., 1834). Madison considered individual conscience "the most sacred of all property." James Madison, *Political Essay: Property*, NAT'L GAZETTE, Mar. 29, 1792,

*reprinted in* SELECTED WRITINGS OF JAMES MADISON 223 (Ralph Ketcham ed. 2006).

Freedom of conscience is even broader than the "free exercise of religion" the First Amendment explicitly protects. Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1491 (1990). But historically, "freedom of religion was the foundation of the broader recognition of freedom of conscience." Brett G. Scharffs, *Why Religious Freedom? Why the Religiously Committed, the Religiously Indifferent, and Those Hostile to Religion Should Care*, 2017 B.Y.U.L. Rev. 957, 983. Those who drafted and ratified the First Amendment "used religious freedom and liberty of conscience interchangeably." Nathan S. Chapman, *Disentangling Conscience and Religion,* 2013 U. Ill. L. Rev. 1457, 1460. "Man worships not himself, but his Maker; and the liberty of conscience which he claims is not the service of himself, but of his God." Thomas Paine, The Rights of Man, 65 (Ernest Rhys ed., 1791). The Founders' then-recent experience with religious persecution produced "a fierce commitment to each individual's natural and inalienable right to believe according to his conviction and conscience and to exercise his religion as these may dictate." *Priests for Life v. United States HHS*, 808 F.3d 1, 5 (D.C. Cir. 2015) (Brown, J., dissenting from denial of Petition for Rehearing En Banc), citing James Madison, *Memorial and*

*Remonstrance Against Religious Assessments*, reprinted in 2 WRITINGS OF JAMES MADISON 183, 184 (G. Hunt ed. 1901) (internal quotation marks omitted).

America's traditional respect for conscience is illustrated by exemptions granting relief from the moral dilemma created by mandatory military service. The Supreme Court, acknowledging man's "duty to a moral power higher than the State," once quoted the profound statement of Harlan Fiske Stone (later Chief Justice) that "both morals and sound policy require that the state should not violate the conscience of the individual." *Seeger*, 380 U.S. at 170, quoting Stone, *The Conscientious Objector*, 21 Col. Univ. Q. at 269. Indeed, "nothing short of the self-preservation of the state should warrant its violation," and even then it is questionable "whether the state which preserves its life by a settled policy of violation of the conscience of the individual will not in fact ultimately lose it by the process." *Id*. It is hazardous for any government to crush the conscience of its citizens. But mandatory participation in abortion threatens to breed a nation of persons who lack *conscience*, forcing religious citizens and organizations to set aside conscience or face ruinous fines. The tsunami of lawsuits challenging the contraception mandate testifies to the gravity of the matter, and the same floodgates are rapidly opening again.

**B.**   **Federal law has long respected the conscience rights of both patients and health care professionals.**

In health care, there is a long history of respect for the conscience and moral autonomy of both patients and professionals. Physicians and patients both have

moral and legal rights that must be zealously guarded. Protecting that integrity is "a hedge against the government's moral tyranny." Chapman, *Disentangling Conscience and Religion,* 2013 U. Ill. L. Rev. at 1499. Liberty of conscience also benefits society because it "undermines the government's tendency toward a moral totalitarianism that society may eventually regret." *Id*. at 1500.

Regardless of the rights of women, demanding that a physician act in a "morally unpalatable manner . . . compromises the physician's ethical integrity" and likely has "a corrosive effect upon [his or her] dedication and zeal" in treating patients. J. David Bleich, *The Physician as a Conscientious Objector*, 30 Fordham Urb. L. J. 245 (2002). Conscientious objector claims are "very close to the core of religious liberty" and "present less danger to the community" than civil disobedience. Nora O'Callaghan, *Lessons From Pharaoh and the Hebrew Midwives: Conscientious Objection to State Mandates as a Free Exercise Right*, 39 Creighton L. Rev. 561, 565 (2006).

After abortion was constitutionalized[2] in *Roe v. Wade*, "conscience clauses began to emerge" in the field of health care. Jared B. Magnuson, *Let Your Conscience Be Your Guide: Comparing and Contrasting Washington's Death With Dignity Act and Pharmacy Regulations After the Ninth Circuit's Decision in*

_____

[2] Since abortion was a matter for the states and was already legal in some, it is more accurate to say that it was *constitutionalized* rather than *legalized*.

Stormans, Inc. v. Wiseman, 52 Ga. L. Rev. 613, 624 (Winter 2018). Congress acted swiftly to preserve the conscience rights of professionals who objected to participating in the procedure. When Senator Church introduced the "Church Amendment" (42 U.S.C. § 300a-7(c)) for that purpose, he explained that: "Nothing is more fundamental to our national birthright than freedom of religion." 119 Cong. Rec. 9595 (1973). Soon thereafter, Congress passed the Hyde Amendment, prohibiting the use of federal funds to perform abortions with limited exceptions.[3] *O'Callaghan, Lessons From Pharaoh,* 39 Creighton L. Rev. at 627-628. Congress passed the Coats-Snowe Amendment in 1996 (42 U.S.C. § 238n), "shield[ing] conscientious medical students and healthcare entities from mandatory abortion training." Carstens, *The Right to Conscience*, 48 Pepp. L. Rev. at 181. Other protections include the Medicare and Medicaid Conscience Clause Provisions, 42 U.S.C. §§1395w-22(j)(3)(B), 1396u-2(b)(3)(B) (managed care providers exempted from covering counseling or referral for procedures that violate their moral or religious views). These federal protections testify to America's time-honored respect for conscience. Almost every state has also enacted conscience clause legislation. Courtney Miller, Note: *Reflections on Protecting Conscience for Health Care*

_____

[3] Originally (1977) the mother's life was the sole exception. P.L. 94-439, § 209. Later versions added exceptions for rape, incest, or severe injury to the mother's health. See https://crsreports.congress.gov/product/pdf/IF/IF12167 (last visited 03/23/24).

*Providers: A Call for More Inclusive Statutory Protection in Light of Constitutional Considerations*, 15 S. Cal. Rev. L. & Social Justice 327, 331 (2006).

Mandatory participation in abortion is as much a frontal assault on conscience as the Establishment Clause evil of compelling citizens to support religious beliefs they do not hold. Even seemingly modest intrusions are constitutionally forbidden: "Thomas More went to the scaffold rather than sign a little paper for the King." *E. Tex. Baptist Univ. v. Burwell*, 807 F.3d at 635 (Jones, J., dissenting from denial of Petition for Rehearing En Banc).

### C. States provide broad constitutional and statutory protection for liberty of conscience.

After the Church Amendment, "the majority of states followed suit within the next few years." Magnuson, *Let Your Conscience Be Your Guide*, 52 Ga. L. Rev.at 624. All states protect liberty of conscience through their constitutions and/or statutes. Miller: *Reflections on Protecting Conscience for Health Care Providers*, 15 S. Cal. Rev. L. & Social Justice at 331.[4] The vast majority of state constitutions expressly define religious liberty in terms of conscience.[5] A few states, while not

---

[4]  When this article was published, forty-nine states had some form of conscience clause legislation, with variations as to which providers, institutions, procedures and payors were covered. Current detailed state-by-state information can be found at: https://www.consciencelaws.org/law/laws/usa.aspx#state ("United States Protection of Conscience Laws," last visited 02/10/2024).

[5]  *See* A.R.S. Const. Art. II, § 12; Ark. Const. Art. 2, § 24; Cal. Const. art. I, § 4; Colo. Const. Art. II, Section 4; Del. Const. art I, § 1; Ga. Const. Art. I, § I, Para. III-

using the term "conscience," provide similar rights by protecting their citizens against state compulsion. Alabama Const. Art. I, Sec. 4; Iowa Const. Art. I, § 3; Md. Dec. of R. art. 36; W. Va. Const. Art. III, § 15. Some state constitutions contain a broad description of religious liberty, limited only by licentiousness or acts that would threaten public morals, peace and/or safety. Conn. Const. Art. I., Sec. 3; Fla. Const. Art. I, § 3; Md. Dec. of R. art. 36; Miss. Const. Ann. Art. 3, § 18. Several states essentially duplicate the language of the U.S. Constitution. Alaska Const. Art. I, § 4; HRS Const. Art. I, § 4; La. Const. Art. I, § 8; Mont. Const., Art. II § 5; S.C. Const. Ann. Art. I, § 2. Oklahoma's unique language provides for "perfect toleration of religious sentiment" and mode of worship and prohibits any religious test for the exercise of civil rights. Okl. Const. Art. I, § 2.

Like their federal counterparts, states face the daunting task of defining "conscience" and formulating a means to assess it and craft appropriate legal protection. Lucien J. Dhooge, *The Equivalence of Religion and Conscience,* 31 ND

---

IV; Idaho Const. Art. I, § 4; Illinois Const., Art. I, § 3; Ind. Const. Art. 1, §§ 2, 3; Kan. Const. B. of R. § 7; Ky. Const. § 1; ALM Constitution Appx. Pt. 1, Art. II; Me. Const. Art. I, § 3; MCLS Const. Art. I, § 4; Minn. Const. art. 1, § 16; Mo. Const. Art. I, § 5; Ne. Const. Art. I, § 4; Nev. Const. Art. 1, § 4; N.H. Const. Pt. FIRST, Art. 4 and Art. 5; N.J. Const., Art. I, Para. 3; N.M. Const. Art. II, § 11; NY CLS Const Art I, § 3; N.C. Const. art. I, § 13; N.D. Const. Art. I, § 3; Oh. Const. art. I, § 7; Ore. Const. Art. I, §§ 2, 3; Pa. Const. Art. I, § 3; R.I. Const. Art. I, § 3; S.D. Const. Article VI, § 3; Tenn. Const. Art. I, § 3; Tex. Const. Art. I, § 6; Utah Const. Art. I, § 4; Vt. Const. Ch. I, Art. 3; Va. Const. Art. I, § 16; Wash. Const. art. 1, § 11; Wis. Const. Art. I, § 18; Wyo. Const. Art. 1, § 18.

J. L. Ethics & Pub Pol'y 253, 270 (2017). Many of the statutory protections, in a variety of contexts, "seem to protect both religious and nonreligious moral convictions." Chapman, *Disentangling Conscience and Religion,* 2013 U. Ill. L. Rev. at 1459. Idaho, Louisiana, and Mississippi define conscience in terms of certain principles sincerely held by any person. Idaho Code Ann.§18-611(b) ("religious, moral, or ethical principles"); (La. Rev. Stat. Ann. §§40:1061.20(A)(1), (B)(1) (a "sincerely held religious belief or moral conviction"); Miss. Code Ann. §41-107-3(h) ("religious, moral, or ethical principles"). Illinois and Pennsylvania expressly reference religious beliefs but also protect comparable moral convictions that are not religiously grounded. 745 Ill. Comp. Stat. 70/3(e); 18 Pa. Cons. Stat.§§3202(d), 3203. Other states have statutory conscience protections related to health care issues, including vaccinations, health care directives, and living wills, but do not define "conscience." *See* Ariz. Rev. Stat. Ann. § 36-3205(C)(1); Ark. Code Ann. § 20-6-109(b); Conn. Gen. Stat. § 19a-131e(b); Fla. Stat. § 381.00315(1)(c)(4); N.M. Stat. Ann.§§12-10A-13(D)(3), 24-7A-7(E); R.I. Gen. Laws § 23-8-4; S.C. Code Ann. § 44-4-520(A)(3); Tenn. Code Ann. §§32-11-108(a), 68-11-1808(d)(1); Tex. Educ. Code Ann. §§38.001(c)(1)(B), 51.933(d)(1)(B); 12 Va. Admin. Code § 30-20-240(5). Definitions vary widely but are generally based on individual moral convictions about belief and action.

State courts also acknowledge rights of conscience, typically weighing those rights against compelling state interests. Conscience has been defined as "that moral sense which dictates . . . right and wrong." *Harden v. State*, 216 S.W.2d 708, 711 (Tenn. 1948) (handling of poisonous snakes could be regulated to protect public health and safety). "Freedom of conscience" is a "fundamental right of every citizen . . . [d]eeply rooted in the constitutional law of Minnesota." *Rasmussen v. Glass*, 498 N.W.2d 508, 515 (Minn. Ct. App. 1993) (ruling in favor of deli owner who refused delivery to abortion clinic). *See also In re Williams*, 152 S.E.2d 317, 326 (N.C. 1967) (free exercise includes protection against government compulsion to do what one's religious beliefs forbid, but it is not absolute); *Frank v. State*, 604 P.2d 1068, 1070 (Alaska 1979) (religiously compelled actions can be forbidden only where they substantially threaten public safety, peace or order); *First Covenant Church v. City of Seattle*, 840 P.2d 174, 187 (Wash. 1992) (city's interest in preservation of aesthetic and historic structures was not compelling enough to burden church's rights to religion and free speech); *Humphrey v. Lane*, 728 N.E.2d 1039, 1043 (Ohio 2000) (ruling in favor of corrections officer whose Native American religion required him to maintain long hair); *Guaranteed Auto Fin., Inc. v. Dir., ESD*, 92 Ark. App. 295, 299-300 (2005) (conditioning availability of unemployment benefits upon willingness to violate "cardinal principles" of religious faith effectively penalized free exercise); *Coulee Catholic Sch. v. Labor & Indus. Review Comm'n*, 768 N.W.2d

868, 886 (Wis. 2009) (first grade teacher's employment discrimination claim against Catholic school employer failed because her position was closely linked to the school's religious mission—noting the "extremely strong language" of the state constitution, "providing expansive protections for religious liberty").

### D. This case implicates *conscientious objectors*—not civil disobedience.

Conscience "involves more than mere belief: it entails acting - living - in accordance with central convictions." Steven D. Smith, *What Does Religion Have to Do with Freedom of Conscience*?, 76 U. Colo. L. Rev. 911, 923 (2005). Belief and action are the "two predominant features" of conscience. Dhooge, *The Equivalence of Religion and Conscience,* 31 ND J. L. Ethics & Pub Pol'y at 266. Belief that abortion is morally wrong leads to action—a conscientious physician must decline participation in the procedure. "A disconnection between beliefs and decisions, . . . whether compelled or voluntarily, generates guilt, regret, shame, and a feeling of loss of personal integrity." *Id*. at 267.

"Actions speak louder than words" is a common idiom reflected in First Amendment precedent about expressive *conduct*. But does precedent against compelled *speech* apply to compelled *conduct*? Not necessarily. But mandating an act that violates conscience, where abstention would ordinarily *not* be illegal, is in some respects analogous to compelled speech. This is particularly true where the mandatory act associates the person with a specific viewpoint he abhors. It is

ordinarily not illegal to refrain from performing an abortion. But compliance with an abortion mandate would affirmatively associate a doctor with a pro-abortion viewpoint. Much like compelled speech, this darkens the "fixed star in our constitutional constellation" that forbids any government official, "high or petty," from prescribing "what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word *or act* their faith therein." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added) (Pledge of Alliance combines speech and action).

Many winning Free Exercise cases decided prior to *Emp't Div., Ore. Dep't of Human Res. v. Smith*, 494 U.S. 872 (1990) involved conscientious objectors seeking freedom from state compulsion to commit an act against conscience. *See, e.g., Girouard v. United States,* 328 U.S. 61; *Sherbert v. Verner*, 374 U.S. 398 (1963) (Sabbath work); *Barnette,* 319 U.S. 624 (1943) (flag salute); *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (high school education). Losing plaintiffs, including *Smith*, are often "civil disobedience" claimants seeking to actively engage in illegal conduct, e.g., *Prince v. Massachusetts*, 321 U.S. 158 (1944) (child labor). O'Callaghan, *Lessons From Pharaoh*, 39 Creighton L. Rev. at 564. *Smith* repeatedly emphasized the *criminal* conduct at issue. *Smith,* 494 U.S. at 874, 878, 887, 891-892, 897-899, 901-906, 909, 911-912, 916, 921.

Court decisions in cases like this one have broad ramifications for the myriad of other situations where legal mandates invade conscience and an exemption does not threaten public peace or safety. Conscientious objector claims are "very close to the core of religious liberty." O'Callaghan, *Lessons From Pharaoh*, 39 Creighton L. Rev. at 565, 611, 615-616. Individual medical professionals should never have to choose between allegiance to the state and faithfulness to God when their beliefs can be accommodated without sacrificing public peace or safety. Considering the high value courts, legislatures, and constitutions have historically assigned to conscience, it is imperative to protect medical professionals who decline to perform morally objectionable acts such as abortion.

## II.    LEGISLATION MAY NOT PREEMPT OUR *FIRST* LIBERTY: RELIGIOUS FREEDOM.

The laws governing reproductive freedom have changed dramatically over the years. At one time the states were free to outlaw contraception or limit it to married couples. That changed in two Supreme Court key decisions preceding *Roe v. Wade*. *See Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (recognizing right of married couples to use contraception due to the "zone of privacy" in that relationship); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (extending the right to single persons). But none of these rulings created  corollary right to draft unwilling accomplices. In the companion case to *Roe v. Wade*, the Court left intact Georgia's statutory protections for health care workers who object to participating in abortions. *Doe v.*

*Bolton*, 410 U.S. 179, 205 (1973); Ga. Crim. Code § 26-1202(e) (1968). But if federal laws are permitted to trump a state's pro-life protections, that threatens to compel an individual doctor to become a de facto accomplice to a morally objectionable procedure. This type of mandate grates against the Constitution, threatening crippling penalties and essentially banning people of faith from full participation in society. This is tantamount to stating that "no religious believers who refuse to [perform abortion] may be included in this part of our social life." O'Callaghan, *Lessons From Pharaoh*, 39 Creighton L. Rev. at 573.

### A.    Abortion is a highly controversial, divisive issue.

Many deeply religious people view abortion as a grave moral wrong. Even with the issue returned to the states, Americans are profoundly troubled and deeply divided.  Whatever "reproductive rights" exist under federal or state law, such rights do not trump the inalienable First Amendment rights of those who cannot in good conscience support—let alone facilitate—those rights. Between *Roe* and *Dobbs*, such rights were plucked out of obscure corners of the Constitution. There was deep disagreement over their continued viability, and the debate continues. Americans on both sides of the debate are entitled to express their respective positions. The government itself may adopt a position but may not compel individuals to facilitate or perform morally objectionable services contrary to conscience. This severe intrusion on liberty of conscience cannot be justified.

**B.** **Liberty of religion and conscience should not be dismantled to compel individual doctors to perform abortions.**

The First Amendment protects against government coercion to endorse or subsidize a cause. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *Barnette*, 319 U.S. 624. The government has no power to force a *speaker* to support or oppose a particular viewpoint. *Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 575 (1995). Here, coerced abortion would extend even further by demanding that medical professionals perform a morally objectionable procedure that associates them with a viewpoint they abhor. Religious liberty collapses under the weight of secular ideologies that employ the strong arm of the state to advance their causes, promoting tolerance and respect for some while ruthlessly suppressing others. Michael W. McConnell, *"God is Dead and We have Killed Him!" Freedom of Religion in the Post-Modern Age*, 1993 BYU L. Rev. 163, 186-188.

America was founded by people who risked their lives to escape religious tyranny and observe their faith free from government intrusion. Congress has ranked religious freedom "among the most treasured birthrights of every American." Sen. Rep. No. 103-111, 1st Sess., p. 4 (1993), reprinted in 1993 U.S. Code Cong. & Admin. News, at pp. 1893-1894. "The struggle for religious liberty has through the centuries been an effort to accommodate the demands of the State to the conscience of the individual." *Girouard v. United States*, 328 U.S. at 68. "[T]he product of that struggle" was the First Amendment's protection for religious liberty. *Id*. We dare

not sacrifice priceless American freedoms to broaden access to abortion. Religious citizens and organizations have not forfeited their right to live and pursue their missions in a manner consistent with their faith and conscience.

### C. Accommodation of a medical professional's conscience does not threaten any person's fundamental rights.

Abortion is not a fundamental right. It is not mentioned in the Constitution, nor is it "implicitly protected by any constitutional provision." *Dobbs*, 142 S. Ct. at 2242. No such right is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." *Id*., quoting *Washington v. Glucksberg*, 521 U.S. 701, 721 (1997). Accommodation of conscientious objections to abortion cannot threaten a right that does not exist. The failure to accommodate would render objecting medical professionals complicit in a procedure they believe is tantamount to infanticide. Even if abortion were given the status of a legal right, no private party is obligated to facilitate it for another person.

## III. COERCED PARTICIPATION IN ABORTION DEMONSTRATES HOSTILITY TO RELIGIOUS LIBERTY AND CONSCIENCE.

In America today, people of faith face an escalating trend to "squeeze them out of full participation in civic life" through government mandates to engage in conduct forbidden by their faith. *Id*. at 561-562. Such mandates may even be accompanied by efforts to "limit or eliminate entirely" statutory conscience protections. O'Callaghan*, Lessons From Pharaoh*, 39 Creighton L. Rev. at 562.

Courts have a "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people." *Lee v. Weisman*, 505 U.S. at 592. Government-mandated abortion attacks conscience, penalizing medical professionals who cannot in good conscience perform abortions. But "[n]o person can be punished for entertaining or professing religious beliefs or disbeliefs . . . ." *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 15-16 (1947). A citizen may not be excluded from the practice of medicine (or any other profession) by unconstitutional criteria. *Baird v. State Bar of Arizona*, 401 U.S. 1, 6-7 (1971) (attorney); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 607 (1967) (professor).

The First Amendment demands government neutrality so that each religious creed may "flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). Coerced participation in abortion guts the First Amendment, brazenly exhibiting the "callous indifference" to religion never intended by the Establishment Clause. *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984), citing *Zorach,* 343 U.S. at 314. The Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Id.*

### C. Conscience protection is particularly urgent where human life is at stake.

Conscience protection for medical professionals is "of paramount importance" because "the role of doctors is to directly influence the length and

quality of human lives." Carstens, *The Right to Conscience vs. The Right to Die*, 48 Pepp. L. Rev. at 180. Concern for the sanctity of human life is evident not only in abortion but in other circumstances where an individual is compelled to participate in ending life. One conscientious objector, seeking an exemption from military duties he considered "immoral and totally repugnant," stated: "I believe that human life is valuable in and of itself; in its living; therefore I will not injure or kill another human being." *Welsh v. United States*, 398 U.S. 333, 343 (1970).

In the health care arena, physician assisted suicide is another growing concern where human life is at risk. One commentator noted "significant inconsistencies" in the State of Washington, where pharmacy owners are "free to exercise their right to not distribute fatal drugs to end the life of a terminal patient but would be forced to violate their consciences by distributing emergency contraceptives that they believe cause harm to newly formed lives in the womb." Magnuson, *Let Your Conscience Be Your Guide*, 52 Ga. L. Rev. at 617-618. The Washington Death with Dignity Act, which began as a voter initiative, offers broad exemptions to conscientious objectors. *Id*. at 616; Wash. Rev. Code Ann. §§70.245.010, 70.245.190. But regulations enacted by the Washington Board of Pharmacy deny protection to pharmacists seeking a comparable exemption. Pharmacist Responsibility Rule, Wash. Admin. Code § 246-863-095 (2017); Delivery Rule, Wash. Admin. Code § 246-869-010(1) (2017). The Ninth Circuit upheld the regulations in *Stormans, Inc. v. Wiseman*, 794

F.3d 1064, 1088 (9th Cir. 2015), and the Supreme Court denied review of "Washington's novel and concededly unnecessary burden on religious objectors." *Stormans, Inc. v. Wiesman*, 136 S. Ct. 2433, 2440 (2016) (Alito, J., dissenting). These two procedures—assisted suicide and emergency contraception—cause "similar harm" to conscience, and both involve the "intentional ending of a life." Magnuson, *Let Your Conscience Be Your Guide*, 52 Ga. L. Rev.at 635. But conscience is not equally protected. This case, too, involves "similar harm" to the conscience of medical professionals.

    **B.**    **Even in the commercial sphere, believers do not forfeit their constitutional rights**.

Legal protection of conscience enhances "government by consent" by ensuring that citizens maintain "personal sovereignty on matters of deep moral conviction." Chapman, *Disentangling Conscience and Religion,* 2013 U. Ill. L. Rev. at 1497. Such "personal sovereignty" does not evaporate in the public sphere where citizens conduct business. Abortion is indisputably an issue that "raises morally grave questions" with a "wide diversity of answers" offered. *Id*. at 1494. Strong protection for conscience maintains the freedom to express minority viewpoints, encourages further dialogue about contested moral issues, and "hedges against the chance that the majority has come to the wrong conclusion." *Id*. at 1500.

Mandatory participation in abortion is hostile to people of faith, effectively squeezing them out of full participation in civic life. O'Callaghan, *Lessons From*

*Pharaoh*, 39 Creighton L. Rev. at 561-563. Religion does not end where daily life begins. When religion is shoved to the private fringes of life, constitutional guarantees ring hollow. McConnell, *"God is Dead and We have Killed Him!"*, 1993 BYU L. Rev. at 176. Morality necessarily intersects the public realm. All individuals and businesses should be free to operate with a high level of honesty and integrity in dealing with the persons they serve.

Conflicts between religion and regulation typically occur in settings beyond the walls of a church. These conflicts may involve either religious citizens who own a business or non-church organizations established for religious purposes:

- *Braunfeld v. Brown,* 366 U.S. 599 (1961) (Sunday closing)
- *Sherbert v. Verner,* 374 U.S. 398 (unemployment benefits)
- *United States v. Lee*, 455 U.S. 252 (1982) (Amish business)
- *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290 (1985) (employment laws)
- *State ex rel. McClure v. Sports & Health Club, Inc.,* 370 N.W.2d 844, 853 (Minn. 1985) (hiring)
- *Rasmussen v. Glass,* 498 N.W.2d 508 (food delivery)
- *Swanner v. Anchorage Equal Rights Comm'n,* 874 P.2d 274 (Alaska 1994) (housing)
- *Attorney Gen. v. Desilets*, 636 N.E.2d 233 (Mass. 1994) (same)
- *Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d 67, 93 (Cal. 2004) (charitable work).

Some claimants succeeded (*Sherbert, Rasmussen, Desilets*), while others did not (*Braunfeld, Lee, Alamo Found., McClure, Swanner, Catholic Charities*). The "commercial" factor did not dictate the outcome.

*United States v. Lee,* 455 U.S. 252 (1982) is often cited to oppose religious exemptions in the commercial sphere. *See, e.g., Catholic Charities of Sacramento, Inc. v. Superior Court*, 85 P.3d at 93. But *Lee* does not hold that believers forfeit their constitutional rights when they step beyond the borders of a church. The frequently cited language, in context, states that "*every* person cannot be shielded from *all* the burdens incident to exercising *every* aspect of the right to practice religious beliefs." *United States v. Lee*, 455 U.S. at 261 (emphasis added). Religious freedom is not abrogated in the public square—and where religious professionals serve the community, as medical professionals surely do, they are entitled to serve in a manner consistent with their faith.

## IV.  THE GOVERNMENT COULD NOT SATISFY THE DEMANDING "COMPELLING INTEREST" OR "LEAST RESTRICTIVE MEANS" PRONGS OF RFRA.

Even if there were viable legal arguments for preemption, "RFRA broadly prohibits the Federal Government from violating religious liberty. See 42 U.S.C. §2000bb-1(a)." *Little Sisters of the Poor v. Pennsylvania*, 140 S. Ct. 237, 2389 (2020) (Alito, J., concurring). Protection for religious liberty covers every "branch, department, agency, [and] instrumentality" of the Federal Government, including any "person acting under the color of " federal law. §2000bb-2(1). It also extends to the "implementation" of the law. §2000bb-3(a).

Sometimes there is a "difficult moral question" about "where to draw the line in a chain of causation that leads to objectionable conduct," and courts "cannot override the sincere religious beliefs of an objecting party on that question." *Little Sisters*, 140 S. Ct. at 2391 (Alito, J., concurring); see *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 723-726 (2014); *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 715-716 (1981). Here, the doctor does not merely participate in a "chain of causation." Personal participation is required if federal law were found to preempt state law protection for unborn life.

There is also no difficulty in ascertaining the weight of the burden. For example, if the government imposed monetary penalties and exclusion from federal funding, these are indisputably "substantial" burdens. Accordingly, the government must "demonstrate[] that application of the burden to *the [doctor]*—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§2000bb-1(a), (b) (emphasis added); *Hobby Lobby*, 573 U.S. at 705. Following *Hobby Lobby*, the Supreme Court's "decisions all but instructed the Departments [of Health and Human Services, Labor, and the Treasury] to consider RFRA going forward." *Little Sisters*, 140 S. Ct. at 2383.

## A. The government could not satisfy the compelling interest prong.

The government "must clear a high bar" to establish a compelling state interest. *Little Sisters*, 140 S. Ct. at 2392 (Alito, J., concurring). Drawing from *Sherbert v. Verner*, the decision codified in RFRA, "only the gravest abuses, endangering paramount interests" justifies the limitation of free exercise. *Id*. at 406, quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945). To establish that it has a "compelling interest" in forcing unwilling doctors to perform abortions, the Government would have to show that it would commit one of "the gravest abuses" of its responsibilities if it did not exercise such coercion over objecting doctors. That is totalitarian nonsense—it is the coerced performance of abortion that would constitute one of "the gravest abuses" of government power this country has ever seen.

The Supreme Court has carefully explained that a heavy burden falls on the *government* to show a compelling interest in applying the challenged law to "the *particular claimant* whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-431 (2006) (quoting §2000bb-1(b)) (emphasis added). That means the government must "scrutinize[] the asserted harm of granting *specific* exemptions to *particular* religious claimants" (*id*. at 43l, emphasis added)—here, the religious

medical professionals who object to performing abortions. There is no indication that the government could possibly jump such a high hurdle.

**B.      The government could not satisfy the least restrictive means prong.**

In the *Hobby Lobby* briefing, the administration asserted a "compelling" interest in "gender equality." *Hobby Lobby*, 573 U.S. at 726. The Court found that interest was too broadly formulated. *Id*. Instead, the government must "specifically identify an 'actual problem' in need of solving" and show that the burden on the particular claimant's rights is "actually necessary" for the solution. "Predictive judgment[s]" and "ambiguous proof" are insufficient. Helen Alvaré, *No Compelling Interest:  The "Birth Control" Mandate and Religious Freedom*, 58 Vill. L. Rev. 379, 432 (2013), quoting *Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729, 2738-2739 (2011). Nevertheless, the Court assumed—*solely for the sake of argument*—that the government had a compelling interest and then tackled the least restrictive means analysis. *Hobby Lobby*, 573 U.S. at 728. The Mandate could not meet the challenge. "The least-restrictive-means standard is exceptionally demanding . . . and it is not satisfied here. HHS has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." *Id*.

## CONCLUSION

This Court should affirm the decision of the district court.

Dated: April 11, 2024        /s/Deborah J. Dewart
Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae*
*Institute for Faith and Family*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)**

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because this brief contains **6,462** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word-counting function of Microsoft Office 2010.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word in 14-point Times New Roman.

Dated: April 11, 2024            /s/Deborah J. Dewart
                                          Deborah J. Dewart
                                          Attorney at Law
                                          111 Magnolia Lane
                                          Hubert, NC 28539
                                          lawyerdeborah@outlook.com
                                          (910) 326-4554

                                          *Attorney for Amicus Curiae*
                                          *Institute for Faith and Family*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2024, I electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 11, 2024

/s/Deborah J. Dewart
Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae*
*Institute for Faith and Family*